921 A.2d 221

**Derek Maurice WILLIAMSON**

v.

**STATE of Maryland.**

**No. 86, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 13, 2007.

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER, (Retired, specially assigned), JJ.

BATTAGLIA, J.

Petitioner, Derek Maurice Williamson, seeks review of the denial of a motion to suppress statements he made after he was detained during the execution of a search warrant at a house that Williamson occupied and just had left. We hold that the court properly denied Williamson's motion because the police had the authority to return Williamson to the house and detain him while the search was conducted.

## I. Introduction

On November 20, 2001,[1] Baltimore County police detectives obtained a search and seizure warrant for 8016 Wynbrook Road, Baltimore County, Maryland, and the persons of Susan Michelle Hubbard[2] and Derek Maurice Williamson. The application for the warrant and attached affidavit stated that police had "received two anonymous narcotics complaints stating that Susan Hubbard and her boyfriend 'Derek' were selling 'crack' cocaine at 8016 Wynbrook Rd. Baltimore, Maryland, 21224;" the affidavit also stated that police had initiated an investigation in which two informants had participated in

---

1. All of the facts, as herein set forth, were developed at the suppression hearing.

2. Hubbard is not a party to this appeal.

three separate "controlled purchases of cocaine" from Ms. Hubbard between August and November 2001.

The search warrant was executed on November 21, 2001, when Detective Timothy Bryant Ward, several other police detectives, and a uniformed officer arrived at 8016 Wynbrook Road and set up surveillance for twenty to thirty minutes. Detective Ward recounted the events which then transpired:

[STATE]: And when was it that you actually executed the warrant? What caused you to say now is the time to execute?

[DETECTIVE WARD]: The target of our investigation, Derek Williamson, was leaving the address to what we believe was the time he went to work. We wanted to get him detained before we—before he left the location.

[STATE]: And what time of day was this?

[DETECTIVE WARD]: Like afternoon, early afternoon.

[STATE]: The location 8016 Wynbrook Road, can you describe what kind of residence—is it a residence?

[DETECTIVE WARD]: Yes. It's a row home.

[STATE]: A row home?

[DETECTIVE WARD]: Yes, sir.

[STATE]: And did he exit the front or the back door?

[DETECTIVE WARD]: The front door.

[STATE]: And when you indicated—you said you wanted to detain him, how did you effectuate that?

[DETECTIVE WARD]: How did we—

[STATE]: How'd you do that?

[DETECTIVE WARD]: Actually, it was, two of my partners identified themselves with "Police," told them why we were there and that we were going to handcuff him.

\*   \*   \*

The Defendant, Williamson, was just handcuffed for our safety until we made entrance into the location of the home.

[STATE]: How far from the front door?

[DETECTIVE WARD]: Twenty, 20, 30 feet. No more than 30 feet.

[STATE]: You—had he reached his car yet?

[DETECTIVE WARD]: If I'm not mistaken, he was just maybe putting the key in to open the door, or the, his hand on the, on the door handle.

[STATE]: And how long did this all take from stopping him at the car and leading him to the front door of the house?

[DETECTIVE WARD]: He was stopped at the car, and then we made entrance into the location, at which time Susan Hubbard was also detained for safety. We made our rounds through the house to make sure that it was clear. So it was probably no more than 15 minutes after he was first stopped at the car.

[STATE]: And the entry into the house, how was that effected?

[DETECTIVE WARD]: Front door was open, the screen door was open. We knocked, identified ourselves as "Police Officer" and entered the location.

Detective Ward also testified as to why Williamson was searched inside the house and not at the car and what occurred after entering the house:

[STATE]: Okay. And why wasn't he searched at his car instead of being brought into the house to be searched?

[DETECTIVE WARD]: Why wasn't he searched at his car?

[STATE]: Right. Pursuant to the search warrant.

[DETECTIVE WARD]: Cause we hadn't read the search warrant, [or] *Miranda* statement . . . to the parties that were named in the warrant.

[STATE]: And is that your practice, to do that before you actually begin the search?

[DETECTIVE WARD]: Yes, sir, it is.

\* \* \*

[STATE]: [W]hen was the first time the Defendant was Mirandized?

[DETECTIVE WARD]: Inside the house before we read the search warrant. Or, I'm sorry, after we read the search warrant.

\* \* \*

[STATE]: And were you present when the search and seizure warrant was read?

[DETECTIVE WARD]: Yes, I was.

[STATE]: And did they have any questions about that?

[DETECTIVE WARD]: Not at that time.

[STATE]: Did they appear to you that they understood English?

[DETECTIVE WARD]: Yes, it did.

[STATE]: Prior to the, or during the course of the execution on the warrant, did you have an opportunity to have any kind of verbal conversation with Mr. Williamson?

[DETECTIVE WARD]: Yes, sir, I did.

[STATE]: And what was that?

[DETECTIVE WARD]: I basically pulled him to the side, and I, and I said to him, you know, why we're here. We're not patrol detectives. The, which time he stated he did. I said, is there any drugs in the home? At which time, if memory serves me correct, he told me that there was a coffee can upstairs in the dresser, in the bedroom.

[STATE]: And did you retrieve that coffee can?

[DETECTIVE WARD]: Yes. Yes, sir I did.

[STATE]: And did you find narcotics in there?

[DETECTIVE WARD]: Yes, sir.

[STATE]: Did you subsequently have more contact with him prior to any transportation to the Precinct?

[DETECTIVE WARD]: Again, I'm not a hundred percent sure. Maybe. I know that I had pulled him aside initially, and we had spoken and we may have had a few more previous conversations but, basically, the search went on, and we recovered the rest of what was recovered at the home.

On cross-examination, Detective Ward iterated that he believed Williamson resided at the house because the police had seen him there several times during their surveillance and because a confidential police informant had told them that Williamson lived there with Hubbard:

[COUNSEL FOR WILLIAM SON]: To your knowledge, there was no evidence that Mr. Williamson resided in that house; isn't that correct?

[DETECTIVE WARD]: I wouldn't say that.

[COUNSEL FOR WILLIAM SON]: What evidence did you have that Mr. Williamson resided in that house?

[DETECTIVE WARD]: I had seen him leave on several occasions before during surveillance, pre-surveillance of that search warrant, and I had information from my Reliable Informant that he was, indeed, living there with Susan Hubbard.

During the search, which took approximately forty minutes, the police discovered three plastic baggies containing cocaine, including the baggie in the coffee can identified by Williamson, three hundred dollars, three straws containing residue, a pen cap containing residue, a clear bag containing a razor with residue, a black digital Tanita scale, and a plastic baggie containing numerous small unused blue plastic baggies.

After completing the search, the police escorted Williamson to the North Point Police Station, where further interrogation occurred:

[STATE]: Was he transported to the Precinct?

[DETECTIVE WARD]: Yes, sir, he was.

[STATE]: At the Precinct did you have an opportunity to speak to him again?

[DETECTIVE WARD]: Yes, I did.

[STATE]: And did you specifically advise him of his rights per *Miranda?*

[DETECTIVE WARD]: I specifically did, yes, sir.

\*     \*     \*

[STATE]: And what questions did you ask him?

[DETECTIVE WARD]: I asked him, basically, if he lived at that location, and he stated to me that he did live there.

[STATE]: Mm-hmm.

[DETECTIVE WARD]: I asked him how long that he lived there and, if memory serves me right—minute please—I asked him how long had he lived there and, and in his handwriting he wrote 18 months.

\* \* \*

[STATE]: And what else did you ask?

[DETECTIVE WARD]: I then asked him the bedroom upstairs, the master bedroom, who sleeps there? To which Mr. Williamson stated in writing, Me and Susan.

[STATE]: And what else did you ask?

[DETECTIVE WARD]: I then asked Mr. Williamson, the safe in the bedroom closet, who does it belong to? Mr. Williamson stated in writing, "It's mine."

[STATE]: What else did you ask?

[DETECTIVE WARD]: I asked Mr. Williamson, the drugs in the safe, who do they belong to? He again stated in writing, "Me."

I then asked Mr. Williamson who weighs and packages the drugs? Mr. Williamson replied, in his handwriting, "I do."

I then finally asked Mr. Williamson, does Susan Hubbard sell cocaine for you? To which Mr. Williamson replied in writing, Yes. She sells drugs to help provide for the family, as well as the bills.

Williamson was indicted on one count of possession of a controlled dangerous substance, cocaine, in violation of Article 27, Section 287 of the Maryland Code,[3] one count of possession

---

3. Section 287 states in pertinent part:
   Except as authorized by this subheading, it is unlawful for any person:
   (a) To possess ... any controlled dangerous substance, unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice.

with the intent to distribute a controlled dangerous substance, cocaine, in violation of Article 27, Section 286 of the Maryland Code,[4] and one count of possession of drug paraphernalia in violation of Article 27, Section 287A of the Maryland Code.[5] Prior to trial, Williamson moved to suppress the drugs and paraphernalia recovered during the execution of the search warrant and the statements he made to police at the scene after he was detained and at the police station. Williamson argued that the application for the search warrant did not establish probable cause for its issuance and that his detention during the search was an illegal arrest because the police actions exceeded the scope of the warrant, so that any of his statements would be inadmissible as the fruits of the illegal detention.

Conversely, the State argued that the warrant did not lack probable cause, and even if probable cause was lacking, the police were acting under a good faith belief that the warrant

---

Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 287. Section 287 was recodified without substantive change as Section 5–601 of the Criminal Law Article, Maryland Code (2002). 2002 Md. Laws, Chap. 26.

4. Section 286 states in pertinent part:
   (a) *Prohibited conduct.*—Except as authorized by this subheading, it is unlawful for any person:
   (1) To ... possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance....
   Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, § 286. Section 286(a)(1) was recodified without substantive change as Section 5–602 of the Criminal Law Article, Maryland Code (2002). 2002 Md. Laws, Chap. 26.

5. Section 287A states in pertinent part:
   (c) *Use or possession with intent to use.*—It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled dangerous substance in violation of this subheading.
   Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 287A. Section 287A was recodified without substantive change as Section 5–601 of the Criminal Law Article, Maryland Code (2002). 2002 Md. Laws, Chap. 21.

was sufficient. The State also contended that the police officer's actions did not constitute "a full-fledged arrest," but merely a temporary stop to search Williamson at the location specified in the warrant and that Williamson's statements should not be suppressed because they were not the fruits of an illegal detention.

Judge Alexander R. Wright, Jr. of the Circuit Court for Baltimore County denied Williamson's motion to suppress his statements as fruits of an illegal detention and determined that the police were entitled to return Williamson to the house and detain him during the search. Williamson subsequently was convicted of possession of a controlled dangerous substance, cocaine, and possession with an intent to distribute a controlled dangerous substance, cocaine, and sentenced to ten years imprisonment without the possibility of parole.[6]

Williamson noted an appeal to the Court of Special Appeals, contending that Judge Wright erred in denying his motion to suppress. Williamson argued that the search warrant was issued without probable cause and even if it were valid, the police were required to search him at the car and release him after the search revealed no drugs or paraphernalia. Williamson also argued that the police could not detain him during the search of the house.[7] In an unreported opinion, the intermediate appellate court affirmed, finding no merit in Williamson's arguments:

---

**6.** Williamson's first trial occurred in December 2002, but resulted in a hung jury. In May 2004, he was retried and convicted. The State nol prossed the charge for possession of drug paraphernalia at Williamson's second trial.

**7.** Before the Court of Special Appeals, Williamson presented three additional arguments: first, that the State was prohibited from impeaching Williamson by questioning him at trial about his prior conviction for possession of cocaine with an intent to distribute; second, that various docket entries must be corrected; and third, that the trial judge failed to exercise discretion in denying his motion to receive drug treatment in lieu of incarceration. These arguments were rejected by the panel, and they were not presented in Williamson's petition for writ of certiorari; therefore, we do not consider them.

Appellant's argument overlooks the fact that the application, which was based in part on three "controlled purchases" at the residence, contained overwhelming probable cause for the search of 8016 Wynbrook Road. There is simply no merit in the argument that [Williamson] "was not in possession of any property described in the search warrant" because the State's case against [Williamson] involved *constructive possession*. As to the issue of whether appellant could be returned to the premises, in *Cotton v. State,* 386 Md. 249, 258–59, 872 A.2d 87 (2005), the Court of Appeals stated:

> [I]n executing a search warrant ... for a premises ... where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of others persons, to take command of the situation and, except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting.... It would be decidedly *unreasonable* to expect the police simply to give a friendly greeting to the folks there and proceed to search the house without another thought as to who those people are or what they may do.

We therefore reject [Williamson's] argument that his Fourth Amendment rights were violated because he was ushered back into the residence.

*Williamson v. State,* No. 826, September Term 2004, slip op. at 5–6 (filed August 17, 2006) (emphasis in original).

We granted Williamson's petition for writ of certiorari, which presented one question which we have rephrased: [8]

---

**8.** Williamson's question presented in his petition for writ of certiorari has been rephrased for purposes of clarity; it queried:

Whether under *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005), an individual can be "ushered" back into a house and detained during the execution of a search warrant where police are in possession of a warrant but have not yet approached the location to be searched

When the police are present at a residence to execute a search warrant, is it reasonable during the search to detain an occupant who just had left the house?

*Williamson v. State,* 396 Md. 9, 912 A.2d 646 (2006). We hold that an occupant who just left the house and was twenty to thirty feet away, can be returned and detained by police during the execution of a search warrant.

## II. Discussion

In reviewing a Circuit Court's grant or denial of a motion to suppress evidence under the Fourth Amendment, we ordinarily consider only the information contained in the record of the suppression hearing, and not the trial record. *Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785, 791 (2005); *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State,* 379 Md. 522, 533, 842 A.2d 773, 779 (2004); *State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003); *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003); *Carter v. State,* 367 Md. 447, 457, 788 A.2d 646, 651 (2002). Where, as here, the motion is denied, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion. *Whiting,* 389 Md. at 345, 885 A.2d at 791; *Nieves,* 383 Md. at 581, 861 A.2d at 67; *Laney,* 379 Md. at 533, 842 A.2d at 779; *Green,* 375 Md. at 607, 826 A.2d at 493; *Rucker,* 374 Md. at 207, 821 A.2d at 444; *Carter,* 367 Md. at 457, 788 A.2d at 651–52. "Although we extend great deference to the hearing judge's findings of fact, we review independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of law and, accordingly, should be suppressed." *Whiting,* 389 Md. at 345, 885 A.2d at 791; *Nieves,* 383 Md. at 581–82, 861 A.2d at 67; *Laney,* 379 Md. at 533–34, 842 A.2d at 779–80; *Rucker,* 374 Md. at 207, 821 A.2d at 444; *Carter,* 367 Md. at 457, 788 A.2d at 651.

---

simply because the individual was seen leaving the house that is the subject of the warrant.

Williamson contends that the trial court erred in denying his motion to suppress the statements made at the scene and at the police station after he was detained during the execution of the search warrant for the house. Williamson concedes that the officers had the right to stop and search him pursuant to the search warrant issued for his person but contends that the search warrant for his person is a "red herring" because the police did not search him when he was at the car. Williamson argues that the police were not entitled to take him back into the house and detain him during the search under *Cotton v. State,* 386 Md. at 249, 872 A.2d at 87, because there was no evidence that he resided at the location, and because he was in the process of leaving the house.

The State, conversely, argues that the trial court did not err in denying Williamson's motion to suppress. The State argues that the police had the right to stop Williamson, bring him back inside the house, and detain him while the search of the house was conducted, pursuant to *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The State contends that the fact that Williamson was leaving the house and was twenty to thirty feet away when the police stopped him at his car does not affect the validity of the detention.

The lawfulness of a detention of a person by police is governed by the Fourth Amendment to the United States Constitution,[9] made applicable to the States by the Fourteenth Amendment, which protects against unreasonable searches and seizures. *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996); *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898 (1968). The Fourth Amendment, however, is not "a guarantee against *all* searches and seizures, but only against unreason-

---

**9.** The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and scizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const., Amend. IV.

able searches and seizures." *United States v. Sharpe,* 470
U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985)
(emphasis in original). Therefore, "[t]he touchstone of our
analysis under the Fourth Amendment is always 'the reason-
ableness in all the circumstances of the particular governmen-
tal invasion of a citizen's personal security'." *Byndloss v.
State,* 391 Md. 462, 480, 893 A.2d 1119, 1130 (2006), quoting
*Terry,* 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904.

■ "Generally, any seizure of a person, whether by arrest
or detention, must be supported by probable cause." *Stan-
ford v. State,* 353 Md. 527, 532, 727 A.2d 938, 941 (1999), citing
*Michigan v. Summers,* 452 U.S. at 700, 101 S.Ct. at 2593, 69
L.Ed.2d at 348. In *Michigan v. Summers,* the Court articu-
lated one basis for the detention of an occupant of a dwelling
which is being searched: "a warrant to search for contraband
founded on probable cause implicitly carries with it the limited
authority to detain the occupants of the premises while a
proper search is conducted." 452 U.S. at 705, 101 S.Ct. at
2595, 69 L.Ed.2d at 351. In that case, police, armed with a
valid search warrant, stopped Summers as he descended the
front porch steps of a house that was going to be searched and
took him back into the house, detained him during the search
and after discovering narcotics in the house, arrested and
searched him, seizing drugs in his coat pocket. In addressing
Summers's contention that probable cause was lacking for his
detention, the Court emphasized the fact that the detention
was "only an incremental intrusion of personal liberty," and
that the search warrant provided "an objective justification for
the detention":

> Of prime importance in assessing the intrusion is the fact
> that the police had obtained a warrant to search respon-
> dent's house for contraband. A neutral and detached mag-
> istrate had found probable cause to believe that the law was
> being violated in that house and had authorized a substan-
> tial invasion of the privacy of the persons who resided there.
> The detention of one of the individuals while the premises
> were searched, although admittedly a significant restraint
> on his liberty, was surely less intrusive than the search

itself. Indeed, we may safely assume that most citizens— unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention.

*     *     *

We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home.

*Summers*, 452 U.S. at 701–03, 101 S.Ct. at 2593–94, 69 L.Ed.2d at 349–50 (citations and footnotes omitted). Further, Justice John Paul Stevens, writing for the Court, enunciated three law enforcement interests, any of which could justify detention during the execution of the search warrant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers" inherent in "the execution of a warrant to search for narcotics [which] is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence"; and "the orderly completion of the search [that] may be facilitated if the occupants of the premises are present," such that the detained occupant's "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Id.* at 702–03, 101 S.Ct. at 2594, 69 L.Ed.2d at 349–50.

As the Court recognized, to justify such a detention, the occupant detained must have a sufficient nexus with the place to be searched such that the police have a reasonable basis to believe that the occupant has a connection with the criminal activity being investigated: "[t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703–04, 101 S.Ct. at 2594–95, 69 L.Ed.2d at 350. As a result, the Court held that "it was lawful to require [Summers] to re-enter and to remain in the house until evidence establishing probable cause to arrest him was found." *Id.* at 705, 101 S.Ct. at 2596, 69 L.Ed.2d at 351.

This Court has had occasion to interpret *Summers*, most recently in *Brown v. State*, 397 Md. 89, 916 A.2d 245 (2007), when Judge Irma S. Raker, writing for the majority, stated:

The clear rule that emerges from *Summers*, in the words of Professor LaFave, "is that police may *always* detain persons found at the premises named in a search warrant, provided (i) the warrant authorizes a 'search for contraband' and (ii) the persons detained are 'occupants.' " 2 Wayne R. LaFave, Search and Seizure § 4.9(e), at 726 (4th ed.2004) (emphasis in original). *See also Muehler v. Mena*, 544 U.S. 93, 98, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' ") (quoting *Summers*, 452 U.S. at 705, n. 19, 101 S.Ct. at 2595, n. 19). The significance of this "standardized procedure," as explained by Professor LaFave, is that even though the Supreme Court *could* have adopted an *ad hoc*, case by case approach, requiring an analysis of whether an officer had reasonable suspicion to believe that the person has committed or was about to commit a crime, the Court "has opted for a standardized procedure to avoid the necessity of case-by-case decisionmaking by police and courts." 2 LaFave, *supra* at 726. The rule works well when the person detained is an owner of the residence or one who

actually lives at the house. Problems arise when the person detained is a visitor or bystander.[10]

*Brown,* 397 Md. at 100–02, 916 A.2d at 252. In this regard, the record in the present case reflects that the police believed Williamson to be an occupant of the residence at 8016 Wynbrook Road. Detective Ward testified at the suppression hearing that he had witnessed Williamson entering and leaving the house several times during pre-warrant surveillance, and that a confidential informant had told him that Williamson lived at the house with Hubbard.

Williamson, however, attempts to distinguish the current factual situation from *Summers* by emphasizing that he was twenty to thirty feet away from the house when the police executed the warrant so that he presented no danger to the officers to require re-entry and detention. Therefore, Williamson contends that the officers must have released him after the search of his person failed to reveal any contraband, and that the detention during the search of the house was unreasonable. The Court of Special Appeals rejected these distinctions as inapposite, as do we.

With respect to the argument that Williamson was outside of the "zone of detention" when he was twenty to thirty feet outside of the house, the Supreme Court in *Summers* did not identify in what proximity one must be in order to have been found "at the premises" in order to justify detention. Our intermediate appellate court, however, has had the opportunity to address such a question. In *Fromm v. State,* 96 Md. App. 249, 624 A.2d 1296 (1993), when police arrived to execute a search warrant for an apartment, they saw Fromm, a known resident of the apartment to be searched, walking out of a neighboring apartment building toward the parking lot. Judge Alan M. Wilner, now retired from this Court, writing for the intermediate appellate court in *Fromm,* opined that the detention of an occupant of a residence during the search

---

**10.** *Brown,* 397 Md. at 100–02, 916 A.2d at 252, dealt with a visitor who approached the property being searched, and *Cotton,* 386 Md. at 253, 872 A.2d at 89, involved a bystander present when a search was conducted.

was appropriate, even though the occupant was not in the premises to be searched when police arrived:

When faced with factually similar situations, courts in other jurisdictions have consistently upheld detentions of persons found outside of dwellings to be searched.

\* \* \*

There is no dispute, in the instant case, that appellant was the subject of a police investigation into illegal drug transactions, that he resided in the apartment that was specified in the search warrant, and that the police officers knew that he resided there and had been shown his picture. Although appellant was not inside his apartment when the officers arrived to execute the search warrant, he, like the defendants in the cited cases, was only a short distance away. The evidence presented at the hearing on the motion to suppress established that he was heading out of a neighboring apartment building and toward the parking lot. In detaining appellant and transporting him the short distance to his apartment, the police officers promoted at least two legitimate law enforcement interests set forth in *Michigan v. Summers*—preventing appellant's flight and facilitating the orderly completion of the search. As the trial court explained, it

"is permissible to detain persons in and about the premises that are specifically identified as having connection with the premises. And this defendant was specifically identified as being the owner or the lessee of the premises. So that I think it was proper to bring him from outside inside during the conduct of the search."

*Id.* at 253, 255–56, 624 A.2d at 1298, 1299 (citations omitted). Thus, proximity of an occupant to the place searched must be evaluated in the context of whether any of the three law enforcement interests articulated in *Michigan v. Summers* are present when the detention occurs.

This balancing formula has been applied by our sister states as well as federal courts in validating or invalidating off-premises detentions of known occupants. In *State v. Madsen*, 129 N.M. 251, 5 P.3d 573 (2000), *cert. denied*, 129 N.M. 249, 4

P.3d 1240 (2000), when police drove into the parking lot of a motel where they were going to execute a search warrant, they observed Madsen, who had been seen during surveillance entering the room to be searched, talking on a pay phone in front of the motel; the police stopped Madsen "approximately 50 to 100 yards away from the room to be searched." After he was detained, Madsen admitted to possessing a firearm; a subsequent search revealed the firearm and several packages of drugs. The New Mexico intermediate appellate court affirmed the denial of Madsen's motion to suppress, emphasizing that his detention served to assure officer safety, to prevent Madsen's flight, and to facilitate an orderly completion of the search:

> Moreover, detaining Defendant advanced all three of the governmental interests outlined in *Summers*. First of all, the detention served the interest of protecting the officers. The officers testified that because they saw Defendant when they arrived at the motel and suspected him of being armed and dangerous, they decided to detain him at the pay phone for safety reasons. Moreover, because Defendant was standing only 50 to 100 yards from the motel room, he might have been in a position to observe the officers executing the search warrant or could have become aware of the execution of the search warrant upon returning to the room. Therefore, he posed a flight risk to the officers. Lastly, by detaining Defendant, the officers could have obtained his cooperation and assistance during the search. Defendant, however, argues that the detention was unlawful because he was not in the motel room when the officers arrived to execute the search warrant. Rather, he was using a pay phone on motel grounds, approximately 50 to 100 yards from the room to be searched. We conclude that, based on Defendant's close proximity and demonstrated connection to the room, the detention at the pay phone was reasonable under the circumstances.

*Id.* at 577 (citations omitted).

Moreover, in *United States v. Fullwood*, 86 F.3d 27 (2d Cir.), *cert. denied*, 519 U.S. 985, 117 S.Ct. 442, 136 L.Ed.2d 338

(1996), as the police approached a house to execute a search warrant, they saw Poindexter, a known occupant of the residence, outside, getting into a vehicle. In assessing the reasonableness of the police detention, the United States Court of Appeals for the Second Circuit accentuated the law enforcement interest in promoting officer safety:

> As the officers arrived to execute the warrant, Poindexter was outside the residence and was entering a vehicle. It was permissible for the officers to require Poindexter to reenter his home and to detain him while they conducted a search of the premises pursuant to a valid search warrant. *It was also prudent for the officers to handcuff Poindexter until they could be certain that the situation was safe.*

*Id.* at 29–30 (emphasis added) (citations omitted).

Additionally, in *State v. Ailport,* 413 N.W.2d 140 (Minn.Ct. App.1987), the police, just prior to executing a search warrant for a hotel room, stopped the room's occupant in the motel parking lot. The intermediate appellate court affirmed the denial of Ailport's motion to suppress, emphasizing the law enforcement interests in promoting officer safety, preventing flight, and preventing the destruction of evidence:

> This court finds that when appellant pulled into the motel parking lot at the same time the officers were about to execute the search warrant, the officers had justification to stop, frisk and detain appellant for at least three reasons: (1) to prevent flight in the event incriminating evidence was found when executing the search warrant on the motel room;
>
> (2) to prevent appellant from alerting or warning the occupants of the motel room of the police's presence, which could lead to efforts to conceal or destroy evidence; and
>
> (3) minimize the risk of harm to officers, since appellant was believed to be armed and dangerous and had a prior felony record.
>
> \* \* \*
>
> Appellant was described to the officers as a very rough-looking individual, who was believed to be dangerous, was

known to carry weapons, and believed to be a fence and involved in narcotics sales. Agent Edward's affidavit submitted with the search warrant indicated appellant had a violent criminal history containing convictions for offenses of aggravated robbery, burglary, narcotics, and possession of a firearm by a felon. In light of appellant's background, his sudden and apparently unanticipated arrival immediately prior to execution of the warrant, and his nervous and furtive movements after observing the police, there was reasonable justification for the officer's restrictive and forceful detention and seizure of appellant.

*Id.* at 144. *See also Commonwealth v. Catanzaro,* 441 Mass. 46, 803 N.E.2d 287, 293 (2004) (stating that the detention of two occupants of an apartment who had just left and "had walked fifty to seventy feet down the driveway" was justified based upon the law enforcement interest in preventing flight and completing the search in an orderly fashion).

Conversely, in *Leveto v. Lapina,* 258 F.3d 156 (3d Cir.2001), Internal Revenue Services agents, armed with a search warrant, stopped Dr. Leveto in the parking lot of his veterinary hospital. The agents drove Dr. Leveto to his house and detained him and his wife while a search of the residence was conducted; subsequently, the agents returned Dr. Leveto to the hospital and detained him while a search of that location was conducted. The United States Court of Appeals for the Third Circuit found the tenets of *Michigan v. Summers* to be inapplicable because the investigation involved alleged tax evasion and neither Dr. Leveto nor his wife posed any danger to officer safety or presented any flight risk, and because they were not needed to facilitate the orderly completion of the searches:

A primary law enforcement interest served by such detention is the prevention of flight in the event that incriminating evidence is found during the search. In this connection, the distinction between searches for contraband and searches for evidence is material. It is not uncommon for a search for contraband to produce items that justify an immediate arrest of the owner or resident of the premises,

and a person who anticipates that a search may imminently result in his or her arrest has a strong incentive to flee. By contrast, a search for evidence—particularly complicated documentary evidence—is much less likely to uncover items that lead to an immediate arrest. Thus, even if the search is successful, the suspect may well remain at liberty for some time until the evidence is examined and an indictment is obtained. As a result, the incentive to flee is greatly diminished.

In Dr. Leveto's case, the agents sought evidence of a suspected tax evasion scheme. A search of this type is unlikely to produce an immediate arrest, and in this case, although the agents allegedly seized thousands of pages of documents and many computer files, ... Dr. Leveto ... was [not] arrested.

Similarly, there was no compelling need to detain Dr. Leveto to protect the safety of the agents. If the agents had been conducting an investigation into a type of offense often accompanied by violence, detention for some length of time might have been reasonable. By the same token, if the agents had possessed information that the Levetos were tied to a violent group or had violent backgrounds, detention for some period might have been justified. Here, however, there is no evidence that such a threat existed. Dr. Leveto was under investigation for tax crimes, and the alleged facts do not suggest that he had any ties to violent organizations or a record of violence. Accordingly, it does not appear that there was any compelling safety reason for detaining him during the lengthy search.

Furthermore, Dr. Leveto's detention did little to advance the interest in orderly completion of the search. The agents apparently did not rely on Dr. Leveto to open locked doors or containers during the course of the search. Similarly, since Mrs. Leveto was at the Levetos' home, there was no apparent need for Dr. Leveto to be present at the home to provide access.

Nor was Dr. Leveto's extended detention necessary to prevent the destruction of evidence.

*Id.* at 170–71.

Therefore, while *Michigan v. Summers* did not articulate a standard by which to judge the validity of a detention based upon the distance between the occupant detained and the premises to be searched, courts applying its tenets have evaluated off-premises detentions of occupants based upon their proximity to the location to be searched taking into consideration the law enforcement interests that were articulated to justify the detention. In the case *sub judice*, the police clearly articulated at the suppression hearing that Williamson, a known occupant of the residence, was stopped twenty to thirty feet away from the house out of concern for officer safety. This concern was recognized by the Supreme Court in *Summers* as compelling when a search warrant is executed for narcotics, as in the instant case. 452 U.S. at 703, 101 S.Ct. at 2594, 69 L.Ed.2d at 349 ("Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence...."). Because the police, to promote officer safety, detained Williamson immediately after he left the house, before he entered his car and drove away, police were justified in detaining him and bringing him back into the house during the search.

In conclusion, the police were justified in returning Williamson to the house at 8016 Wynbrook Road, and detaining him during the search of the house, when he was leaving the residence and was twenty to thirty feet away from the house when the police executed the warrant, and so, we hold that the trial court correctly denied Williamson's motion to suppress his statements.

### *JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.*