36 A.3d 1026

**Devin Jermaine FIELDS**

v.

**STATE of Maryland.**

No. 0656, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 2, 2012.

Bradford Peabody (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: KEHOE, HOTTEN, J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

KEHOE, J.

In *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court held that police officers executing a search warrant acted reasonably in temporarily detaining the occupant of the premises while the search was conducted. The principal issue in this case is whether the *Michigan v. Summers* analysis applies when police officers detain a non-occupant who approaches the premises while the search is underway.

After a jury trial in the Circuit Court of Baltimore County, Devin Jermaine Fields was convicted of possession of cocaine with intent to distribute, a violation of MD.CODE ANN., CRIM. LAW § 5–602 (2002, 2007 Supp.). In his appeal to this Court, Fields presents two issues, which we have reworded:

1. Whether the circuit court erred by denying Fields's motion to suppress.

2. Whether the administrative judge abused his discretion by denying a motion to continue the trial.

For the reasons set forth below, we shall affirm the judgment of the trial court.

## BACKGROUND

Fields does not challenge the sufficiency of the evidence. We therefore confine our discussion to the record as it pertains to the issues before us. *See Singfield v. State,* 172 Md.App. 168, 170, 913 A.2d 671 (2006).

This case involves events that took place on May 15, 2008 in Pikesville, when Baltimore County police executed a search warrant at 7402 Rockridge Road. The police arrested Fields at that address while executing the warrant. As a result of evidence seized from his person after the arrest, a grand jury returned an indictment charging Fields with simple possession of cocaine and possession of cocaine with intent to distribute. As noted above, the jury returned a guilty verdict on the

possession with intent to distribute count. The trial court sentenced Fields to ten years' incarceration without the possibility of parole.

## The Suppression Hearing

Fields filed a pre-trial omnibus motion pursuant to Md. Rule 4–252, including a motion to suppress evidence. The circuit court conducted a hearing on the motion on March 10, 2009, at which two members of the Baltimore County Police Department and Fields himself testified.

Detective John Keeney testified that the Department had obtained a search warrant for a single family house located at 7402 Rockridge Road in Pikesville to search for evidence of illicit drug activity. (The validity of the warrant is not at issue.) Keeney and another officer were assigned to a "pre-raid surveillance" of the house. From a vantage point about three blocks away, he had an unobstructed view of its front door. It was 8:00 p.m. and was still "daylight." Keeney first spotted Fields when the latter "arrive[d] at the location, went inside, stayed briefly and then exited the location, spoke with another male subject, got into the driver's seat of a black Infiniti and then left."

About a half-hour later, the police entered the house without incident through an unlocked screen door. Once inside, the officers "secured everybody in the residence" while Keeney stood watch near the front door. At this point, the Infiniti returned. According to Keeney, Fields got out of the car and started toward the house. Keeney and other officers approached Fields to ascertain his identity and to ask him why he was there. Keeney identified Fields as the same person who had earlier visited the house.

Sergeant Mike Thayer also testified. He stated that, while participating in the execution of the search warrant, he saw Fields open the gate to a fence that enclosed the yard and start to walk towards the front door. By the time Fields was about halfway to the house, Thayer and Keeney went down to

"greet him ... to identify him." Thayer elaborated on the encounter:

[PROSECUTOR:] Okay. And when you approached the Defendant to meet up with him, what happens at that point?

A. I asked him if he had any identification on him. I then proceeded to ask him if he had any guns drugs or weapons on his person.

Q. Okay.

A. He advised me no. At that point I asked him for consent to search his person, which he says, yes, okay, you can search me.

Q. Okay. And when you ask that question, about how far is Defendant from you at this point?

A. Probably within three to four feet of each other.

Q. Okay. And what, what was the tone of voice you were using when you asked him?

A. Approximately about what I am right now.

Q. All right. And had you done anything to physically restrain him at that point?

A. No, I did not.

Q. Ha[d] you even touched him at that point?

A. No, sir.

Q. Okay. How were you dressed that evening?

A. In plainclothes.

Q. And you indicated that he did, in fact, consent to the search; is that right?

A. Yes, sir.

Q. Okay. Did, in terms of getting him to consent, did you promise him anything?

A. No, sir.

Thayer recalled that the initial encounter with Fields was cordial. After the officers asked him for identification, Fields produced his "Maryland Identification Card." While Fields was handing over his identification, Thayer was asking him "other questions—you know, about guns, drugs or weapons,

and then can I search him, and he said, yes, I could." Keeney took the card, ran a license check, and Thayer commenced the search. Up to this point, no officer had touched Fields in any manner and had not told him that he had to stay. Acting on Fields's consent, Thayer found a clear bag of cocaine in Fields's left pocket and placed him under arrest. He also recovered "$600 in U.S. currency." After the officers brought Fields inside the house, he volunteered "that he left to pick up cocaine to come back to party with the people that were [at] the location." None of the officers had questioned Fields before he made this statement.

The third witness at the suppression hearing was Fields himself. His account contradicted that provided by the police officers. Fields offered, for example, that a policeman grabbed him and reached into his pocket after he had refused their request to search.

The motions court denied Fields's motion to suppress, ruling in part as follows:

> THE COURT: I make the ... following findings based on the testimony. On or about ... May 15th, 2008 Defendant was observed by then Officer Keeney during pre-raid surveillance of 7402 Rockridge Road, which is located in Pikesville, Baltimore County, Maryland. The Defendant was observed driving a black Infiniti. He arrived at 7402 Rockridge Drive or Road. This was a home that was suspected of drug activity or a home where suspected drug activity took place. That's why it was under pre-raid surveillance. The Defendant exited his vehicle. He entered the home, stayed a brief time and returned to his vehicle, left the property.
>
> \* \* \*
>
> When the Defendant returned in his black Infiniti he opened the gate to the property.... Defendant entered through the gate, walked towards the steps to the entrance and, as he did so, he encountered Sergeant Thayer. Officer Keeney and Sergeant [Thayer] was also out in the yard. None of these officers were dressed in police clothes. However, they were wearing their weapons.

The testimony of Sergeant Thayer I find credible. He testified that he asked the Defendant for identification. The Defendant retrieved, a Maryland Identification Card. That card was then given to Officer Keeney. Sergeant Thayer testified that he then immediately, or simultaneously was asking for the identification, asked the Defendant whether he had any drugs, weapons or guns. The Defendant's response was no. Sergeant Thayer then asked Defendant for permission to search him, for consent to search.

The Defendant has testified that his response to that question from Sergeant Thayer was, ["]Search me for what,["] and that he told the police officers that they could not search him. However, I find [that] the testimony of Sergeant Thayer and Officer Keeney is more credible. I do find that the Defendant consented to the search.... I find he was initially cordial in his response to the officers and cooperative, that he did voluntarily give his consent for the search and, as a result of that voluntary consent ... there was a packet of cocaine found along with $600 in cash [in a pocket of Field's pants].

The motions court also found that Fields, while not provided with *Miranda* warnings, volunteered "that he had left the house earlier to pick up some cocaine and come back and party[.]" The court concluded that the "police were within their rights and their authority to question the Defendant for I.D. and to act for their own safety. More importantly, the Defendant voluntarily consented to the search...."

DISCUSSION

### I. The Motion to Suppress

 We review the circuit court's ruling on a motion to suppress based solely on the record developed at the suppression hearing, viewing the evidence and reasonable inferences drawn therefrom in the light most favorable to the prevailing party. *See Smith v. State,* 414 Md. 357, 361, 995 A.2d 685 (2010); *Massey v. State,* 173 Md.App. 94, 100, 917 A.2d 1175 (2007). Fields challenges the circuit court's denial of his

motion to suppress on two grounds. First, he asserts that he was illegally detained by the officers as he approached the house. Whether a detention or a search is reasonable is a mixed question of law and fact, *Longshore v. State*, 399 Md. 486, 525–26 n. 9, 924 A.2d 1129 (2007), which we review *de novo*. *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. Johnson*, 367 Md. 418, 424, 788 A.2d 628 (2002). Second, he contends that he did not consent to the search of his person. A determination as to consent is one of fact, which we review for clear error. *Scott v. State*, 366 Md. 121, 143, 782 A.2d 862 (2001).

### A. The Detention

Fields did not reside in the house that was the subject of the search warrant. From this, he argues that the "law enforcement justifications" as set forth in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), are not satisfied in this case. He distinguishes the decisions in *Cotton v. State*, 386 Md. 249, 872 A.2d 87 (2005), *cert. denied*, 546 U.S. 885, 126 S.Ct. 212, 163 L.Ed.2d 190 (2005), and *Brown v. State*, 397 Md. 89, 916 A.2d 245 (2007), urging that these cases are inapposite because he was neither present in the house when the police arrived to execute the warrant nor in the process of entering the house. He also emphasizes that the police did not consider him to be a threat when they encountered him in the front yard. Finally, he argues that, because the search was nearing completion, his detention was "not a question of the officers 'gaining [his] assistance,' in order 'to facilitate an orderly and quick search.'"

■ We are not persuaded by these arguments. *Michigan v. Summers* and other cases have established that, when executing a search warrant, police officers may reasonably detain persons found in and about the premises for reasons of safety and to secure the premises being searched. While the particular issue presented by this case, *viz.*, that the person detained was walking towards the premises being searched, is a matter of first impression in this State, our conclusion that the police acted reasonably in detaining appellant is fully

consistent with Maryland law and supported by persuasive decisions from other jurisdictions.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" The amendment's "protections extend to brief investigatory stops of persons ... that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).[1] The central requirement of the Fourth Amendment is that searches and seizures be "reasonable." *Samson v. California,* 547 U.S. 843, 855 n. 4, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). As a corollary, "the Fourth Amendment ... is not 'a guarantee against *all* searches and seizures, but only against unreasonable searches and seizures.'" *Williamson v. State,* 398 Md. 489, 501–02, 921 A.2d 221 (2007) (quoting *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (emphasis in *Sharpe* )). "Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms,* 434 U.S. 106, 108, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). "The public interest ... includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort." *United States v. Sakyi,* 160 F.3d 164, 167 (4th Cir.1998).

The landmark case regarding the authority of police officers to detain persons while executing a search warrant is *Michigan v. Summers.* In that case, Detroit police officers were in the process of executing a warrant to search a house for

---

1. "The protections of the Fourth Amendment [apply] to the States by virtue of the Fourteenth Amendment ... and its provisions are construed *in pari materia* with those of Article 26 of the Maryland Declaration of Rights.... Constructions of the federal amendment by the United States Supreme Court are controlling authority." *Muse v. State,* 146 Md.App. 395, 401 n. 7, 807 A.2d 113 (2002) (citations omitted).

narcotics when they encountered Summers descending the front steps. The officers asked him to help them enter the structure, and they then detained him while they searched the house. The police arrested Summers after they discovered narcotics on the premises and ascertained that he was the homeowner. 452 U.S. at 693, 101 S.Ct. 2587. A search of his person incident to the arrest yielded an envelope containing heroin, and Summers was charged with the possession of that substance.

The Supreme Court reversed a decision by the Michigan Supreme Court holding that evidence of the heroin should be suppressed. Writing for the majority, Justice Stevens explained the "general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." The Court then emphasized cases that "demonstrate [an] exception for limited intrusions" in situations that are not confined to the "momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* [*v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] and *Adams* [*v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ].[ ]" 452 U.S. at 700, 101 S.Ct. 2587 (footnote omitted).

To determine whether the "general rule" that requires the justification of probable cause should apply, the Court considered it "necessary to examine both the character of the official intrusion and its justification." *Id.* at 701, 101 S.Ct. 2587. That a search warrant had been issued by a "neutral and detached magistrate" is of "prime importance" in identifying the character of the detention:

> The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.[ ] Indeed, we may safely assume that most citizens— unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions.

*Id.* (footnote omitted).

The Court then identified three interests furthered by temporary detentions of occupants: "preventing flight in the event

that incriminating evidence is found;" minimizing the risk of harm to the officers and others; and facilitating the "orderly completion of the search." *Id.* at 702–03, 101 S.Ct. 2587. In light of the nature of the intrusion and the interests furthered by temporary detention, the Court concluded:

> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.[ ] Thus ... we hold that a warrant to search for contraband [ ] founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.[ ]

*Id.* at 704–05, 101 S.Ct. 2587 (footnotes omitted); *see also Los Angeles County v. Rettele*, 550 U.S. 609, 614, 127 S.Ct. 1989, 167 L.Ed.2d 974 (2007) (per curiam) (In "executing a search warrant officers may take reasonable action to secure the premises and ensure their own safety and the efficacy of the search," by detaining occupants of the premises.); *Muehler v. Mena*, 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) ("An officer's authority to detain [a resident] incident to a search is categorical; 'it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' ") (quoting *Summers*, 452 U.S. at 705, n. 19, 101 S.Ct. 2587).

In *Summers*, *Muehler*, and *Rettele*, the persons detained were occupants of the premises subject to the warrant and who were discovered on the premises while the warrant was executed. Relying on *Summers*, Maryland courts have upheld detentions in cases where the relationship between the persons detained, the premises searched, and the execution of the warrant was more attenuated.

In *Fromm v. State*, 96 Md.App. 249, 624 A.2d 1296 (1993) (on motion for reconsideration), the police obtained a search warrant for Fromm's apartment. As they approached the apartment to execute the warrant, police saw Fromm leave

the apartment building next door and head towards the parking lot. *Id.* at 251, 624 A.2d 1296. Officers recognized Fromm and detained him, while the remainder of the police went to the apartment. *Id.* Fromm was taken to his apartment during the execution of the warrant, and at some point was placed in handcuffs. He then gave an inculpatory statement. *Id.*

Seeking to suppress the statement that was derived from what he asserted was an illegal stop, Fromm challenged his detention. He urged that he was not an "occupant" of the targeted apartment because he was walking towards his automobile during the search and that *Summers* accordingly did not apply. *Id.* at 252, 624 A.2d 1296.

In an opinion authored by then Chief Judge Wilner, we distinguished the case factually from *Summers* and inquired "whether the detention of appellant was proper even though he was not on the premises to be searched when the police arrived." *Id.* at 253, 624 A.2d 1296. This Court observed:

> Although appellant was not inside his apartment when the officers arrived to execute the search warrant, he ... was only a short distance away.... In detaining appellant and transporting him the short distance to his apartment, the police officers promoted at least two legitimate law enforcement interests set forth in *Michigan v. Summers*—preventing appellant's flight and facilitating the orderly completion of the search.

*Fromm,* 96 Md.App. at 255–56, 624 A.2d 1296.

In both *Summers* and *Fromm,* the defendant resided in the premises to be searched. In *Cotton v. State,* the defendant's relationship was more coincidental. When officers arrived at a residence to execute a search warrant, they encountered Cotton and three others standing near the porch of the target residence. 386 Md. at 253, 872 A.2d 87. Cotton neither resided at the home nor had he been implicated in a lengthy investigation of drug activity in and around the property in question. *Id.* at 252, 872 A.2d 87. Nonetheless, the police handcuffed Cotton and detained him. 386 Md. at 268, 872

A.2d 87. When interviewed by the police, Cotton admitted that he had a bag of marijuana in his pocket, which an officer found as he patted Cotton down. *Id.* at 254, 872 A.2d 87.

Now writing for the Court of Appeals, Judge Wilner noted that, in the wake of *Summers,* "three lines of cases had developed" regarding the detention of persons during the execution of search warrants:

[T]hose flatly holding that only actual residents of the home may be detained while the search proceeds; those adopting that view generally but allowing the detention of non-residents if the police "can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the search warrant"; and those that "broadly define 'occupants' to include those visiting the residence to be searched."

*Cotton,* 386 Md. at 257, 872 A.2d 87 (citing *Stanford v. State,* 353 Md. 527, 535–38, 727 A.2d 938 (1999)).

The *Cotton* Court then identified the appropriate test:

Subject to further instruction from the Supreme Court, we think that the second two approaches, or some synthesis of them, are more consistent with recent jurisprudence and represent a more reasoned and practical solution, in that they focus on the actual circumstances surrounding the issuance and execution of the warrant.... [P]ersons, other than just residents, who are found in or about the premises are likely to be temporarily detained as well, at least until the police can find out who they are and whether they are involved in any of the illegal activities taking place at the home.

*Id.* at 257–58, 872 A.2d 87.

Applying this rule to the facts before it, the Court concluded that

in executing a warrant such as that issued here, for a premises known to be an open-air drug market where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and,

except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting. It really cannot be otherwise.

*Id.* at 257, 872 A.2d 87.

Two additional cases, *Brown v. State,* 397 Md. 89, 916 A.2d 245 (2007), and *Williamson v. State,* 398 Md. 489, 921 A.2d 221 (2007), are instructive because the Court applied the *Cotton* analysis in different contexts. In *Brown,* the Court held that officers executing a search warrant for a residence reasonably detained an individual who knocked on the front door of the premises to inquire about his identity and relationship to the subject residence. Drawing on its analysis in *Cotton,* the Court emphasized that both the Supreme Court in *Summers* and those cases that have relied on its analyses have sought to "set out essentially a 'standardized procedure,' focusing primarily upon the safety of the police officers executing the warrant and on others in close proximity." 397 Md. at 102, 916 A.2d 245. Judge Raker then asked, and answered, the salient question in light of this prudential concern:

> The question in the instant case then becomes: Was it clear to the police executing the search warrant that [Brown], when he knocked on the door, was a person clearly unconnected with any criminal activity or one who clearly presented no potential danger? *Cotton* has resolved the issue in this case and provides the answer: the answer is the same as the view of the Court of Special Appeals—a resounding NO.

*Brown,* 397 Md. at 103, 916 A.2d 245.

In *Williamson,* an affidavit supporting the application for a search and seizure warrant stated that Williamson was selling drugs from that location. 398 Md. at 491, 921 A.2d 221. As police officers prepared to execute the warrant, they saw him leave the premises. *Id.* at 492–93, 921 A.2d 221. When Williamson was about "20, 30 feet" from the door, he was stopped by the police and frisked. Even though the frisk revealed no weapons or contraband, Williamson was hand-

cuffed and detained while the house was searched. *Id.* at 493–94, 921 A.2d 221. Applying *Cotton,* the Court held that officers acted reasonably in detaining Williamson during the search. *Id.* at 511, 921 A.2d 221.

 We now return to the case before us. In his brief, Fields emphasizes that his initial interaction with the officers was cordial, so he could not reasonably have been perceived as a threat. He also points out that the officers left the house to meet him before he entered the premises, and implies that their action virtually eliminated him as a threat to the integrity of the ongoing search because he was stopped before actually reaching the house itself.

We are not persuaded that an apparently benign interaction removes the initial encounter in this case from the justifications set forth in *Summers* and *Cotton.* First, it is not at all clear that the officers "perceived" no threat. For example, Sergeant Thayer stated on cross-examination that "[t]here's a possibility" that Fields might have "potentially" had a weapon. Additionally, Fields's argument that he could not reasonably be perceived as a threat by the officers because he was in the yard, as opposed to at the house itself, is undermined by *Williamson's* rejection of the argument that the defendant in that case could not have been a threat to the officers because he was departing the house.

 More importantly, a person who is subjected to a limited detention pursuant to *Summers* may not dictate the contours of the police response simply on the basis of good behavior. Indeed, a "perceived" threat is not a prerequisite for the detention authorized by *Summers;* instead, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers,* 452 U.S. at 702–03, 101 S.Ct. 2587. Hence, the limited detention that is sanctioned by *Summers* does not depend on the presence of a threat, actual or perceived, to the officers executing the warrant.[2]

---

2. While the authority of police officers to *detain* individuals on the premises while a search warrant is being executed is "categorical,"

██ That Fields was cooperative is laudable, but does not obviate the need for officers to be proactive during the warrant execution process. The detention authorized by *Summers* is objectively justified by the existence of a search warrant for the target residence and the necessity of executing the warrant in a safe, orderly fashion. *See Summers*, 452 U.S. at 705 n. 19, 101 S.Ct. 2587 ("[I]f police are to have workable rules, the balancing of the competing interests inherent in the *Terry* principle 'must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers.'") (quoting *Dunaway v. New York*, 442 U.S. 200, 219–20, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (White, J., concurring)).

That the officers left the house to intercept Fields is not enough to distinguish this case from *Brown*. Fields was clearly headed toward the house and he had already entered the yard after opening the gate in the property's fence. We believe that requiring police officers to differentiate between an individual who is approaching the target residence but has not yet actually attempted to enter and one who is literally or figuratively knocking on the door "would be to strip law enforcement of the capacity to 'exercise unquestioned command of the situation,' at precisely the moment when *Summers* recognizes they most need it." *United States v. Bailey*, 652 F.3d 197, 206 (2d Cir.2011).

Our conclusion that police officers may intercept and detain an individual who approaches a premises while a search warrant is being executed finds support in decisions of several United States Circuit Courts of Appeal. *See United States v. Jennings*, 544 F.3d 815, 818–19 (7th Cir.2008) (Detaining an individual who drove up and parked next to an apartment

---

their authority to frisk those persons is not. "This Court recognizes, and [the State] concedes, that [the *Michigan v. Summers*] rationale does not necessarily justify a *Terry* frisk of all occupants of a place being searched pursuant to every valid warrant. *Terry* still requires particularized suspicion articulating the potential danger posed by individuals anticipated to be on the premises to be searched by the police." *Dashiell v. State*, 374 Md. 85, 105–06, 821 A.2d 372 (2003).

while it was being searched was "a logical extension of the rule of *Summers*" in order to ensure the safety of the officers engaged in the search and to protect the validity of the search itself.); *United States v. Bohannon*, 225 F.3d 615, 617 (6th Cir.2000) (Detention was justified to protect officer safety when an individual drove up to a trailer, exited his vehicle and approached the trailer while it was being searched as a suspected methamphetamine laboratory.); *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir.1995) (Police may detain persons seen approaching a residence as the police arrive to execute a search warrant; "we cannot say that a detention of fifteen minutes time to identify and release a fairly large group of people during a drug raid is unreasonable."), *United States v. Patterson*, 885 F.2d 483, 485 (8th Cir.1989) ("The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances.").

To conclude, the police acted reasonably in detaining Fields after he encroached into the yard of the residence. Fields's brief prior visit to the house while the property was under surveillance, coupled with his return a short time later as the warrant was being executed, suggests that he might have been involved in purchasing or selling drugs. As such, he was not a person who was "clearly ... unconnected with any criminal activity and who clearly present no potential danger," *Cotton*, 386 Md. at 258, 872 A.2d 87. Fields's cooperative demeanor *after* he was first approached by the officers does not change the analysis.

### B. The Frisk

We now turn to Fields's second argument, namely, that the motions court erred when it found that he had consented to the search of his person. Fields argues that his consent to the search was invalid, and his argument suggests that the circumstances of his detention virtually compelled his consent. He notes that neither officer informed him that he

was free to leave and that both officers were armed. Fields contends that his consent was the product of intimidation because no reasonable person would ignore the officers and walk away. We do not find this analysis to be persuasive.

Based on the totality of the circumstances, we conclude that the motions court did not clearly err in finding that Fields consented to the search. The Supreme Court has "rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless search." *United States v. Drayton*, 536 U.S. 194, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (citing *Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). That the police wore their service weapons is likewise not dispositive. "The presence of a holstered firearm ... is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Drayton*, 536 U.S. at 205, 122 S.Ct. 2105. There is nothing in the record to demonstrate that the initial encounter in which the officers requested Fields's consent to a search was threatening or coercive. Nothing that the officers said to Fields "indicated a command to consent to the search." *Id.* at 206, 122 S.Ct. 2105. As Justice Kennedy observed in *Drayton:*

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

536 U.S. at 207, 122 S.Ct. 2105.

Finally, we reject Fields's claim that his consent was undermined by the invalidity of the initial detention. Because that detention was permissible under *Summers*, *Brown* and *Cotton*, we conclude that this aspect of Fields's encounter with the police does not invalidate his consent.

We affirm the denial of Fields's motion to suppress.

## II. The Motion for a Continuance

Fields next complains of the trial court's refusal to continue the case. This issue developed on the morning set for trial, March 23, 2009. After the case was called, Fields's trial counsel requested that the administrative judge postpone Fields's trial because an unrelated case involving counsel had been called for trial in Baltimore City for the next day. The administrative judge noted that he had set the date for Fields's trial on February 2, 2009. The following exchange occurred:

> [THE COURT]: Just because the case in the city was called two days ago doesn't take precedence over a case that I set back in February. I'm not doing it. And what are we doing with it?
>
> [DEFENSE COUNSEL]: My associate will be out here. I'll call him up and he'll come out and try it.

To this Court, Fields asserts that the administrative judge's "arbitrary" denial of a continuance and insistence on replacement counsel interfered with his "ability to choose and retain an attorney" and that, as a result, his right to counsel guaranteed by the Sixth Amendment was compromised. The State retorts that this argument is not before us because Fields never raised it before the administrative judge. In the alternative, the State maintains that the administrative judge acted within his discretion by denying the postponement.

We agree that Fields's constitutional argument is not before us. In *Stone v. State*, 178 Md.App. 428, 941 A.2d 1238 (2008), Stone argued that the sentencing court's refusal to postpone sentencing to allow Stone to secure counsel of his choice violated his constitutional right. Because Stone had neglected to present that argument before the sentencing court, we concluded that this argument had not been preserved. We reiterated that "[w]hen the defendant asserts one ground for an objection at trial, 'he or she normally is limited to those grounds on appeal.'" *Stone*, 178 Md.App. at 452, 941 A.2d 1238 (citations omitted).

Even if his constitutional argument were properly before us, we would conclude that Fields's challenge fails to establish that the administrative judge abused his discretion by declining the request to continue the trial. A decision of this nature is entrusted to the sound discretion of the administrative judge. *Stone,* 178 Md.App. at 453, 941 A.2d 1238 (citing *Abeokuto v. State,* 391 Md. 289, 329, 893 A.2d 1018 (2006)). In this case, defense counsel sought an eleventh-hour continuance in favor of going to trial in Baltimore City in a case that had been scheduled after the scheduled trial date in the case *sub judice.* The administrative judge did not abuse his discretion in denying the request.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED.**

**APPELLANT TO PAY COSTS.**