572 A.2d 1086

Vincent Lamont QUINCE

v.

STATE of Maryland.

No. 42, Sept. Term, 1989.

Court of Appeals of Maryland.

May 3, 1990.

Nancy S. Forster, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for petitioner.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

McAULIFFE, Judge.

Vincent Lamont Quince challenges his conviction of unlawfully carrying a handgun on the ground that the .357 magnum pistol he was carrying in his waistband was discovered as a result of an impermissible search. The search in this case was a "pat-down" of the defendant's person, conducted immediately after a stop that the State contends was grounded on the reasonable and articulable suspicion of a police officer that the defendant was armed. The question before us is whether the information in the possession of the police officer, and in the possession of the police dispatcher who put out the call, was sufficient to justify the stop and pat-down search.

On 17 December 1987, Private First Class Robert Garland, Jr., was pursuing his duties as a member of the Towson State University Police Department. At that time, Officer Garland had approximately 10 years experience as a campus police officer. At 11:30 a.m. he received a radio call from the dispatcher that there was a "man with a gun at the lower dining room." Garland and other officers promptly proceeded to Newell Hall, on the east side of the

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

campus, where the dining hall is located. En route, Officer Garland was given additional information by the dispatcher. He was told that the subject with a gun was a black male, wearing a dark jacket and dark slacks, and was accompanied by a black female. Additionally, Officer Garland was told that the complaint had been made by the manager of the dining hall; that the subject with the gun was a former employee of the dining hall who was in the area to pick up his final pay check; that this subject had been observed "wandering about the dining hall"; and, that several employees had informed the assistant manager, who in turn informed the manager, that the subject "always carried a firearm." Finally, the dispatcher told Officer Garland that the subject was leaving the dining hall and proceeding toward the bus stop located across the street.

Upon his arrival at Newell Hall, Officer Garland observed a black male at the bus stop, in the company of a black female. The black male was the defendant, Quince. Officer Garland drove past the bus stop and made a U-turn, to get a better view of Quince. Satisfied that Quince fit the description given by the dispatcher, Officer Garland, in the company of Lieutenant Wheatley, alighted from his vehicle and approached Quince. The officers had their guns drawn, but pointed downward at their sides.

Quince made no unusual movements, and responded promptly to the commands of the officers. He was told to turn around and place both hands against an adjacent telephone booth, which he did. Officer Garland asked Quince if he was armed, and Quince said that he was not. Garland then conducted a pat-down search for weapons, and found a loaded .357 magnum pistol in the defendant's left front waistband.

Quince was charged with unlawfully wearing or carrying a firearm. The defendant challenged the legality of the search and seizure by filing a timely motion to suppress. The motion was heard immediately before the commencement of trial in the Circuit Court for Baltimore County. Judge William R. Buchanan, Sr., found that Officer Gar-

land, relying upon the information given him by the dispatcher, had a reasonable articulable suspicion that criminal activity was afoot. Accordingly, he denied the motion to suppress. Quince proceeded to trial before Judge Buchanan on an agreed statement of facts, and he was found guilty. He appealed, and the Court of Special Appeals affirmed in an unreported opinion. We granted Quince's petition for certiorari, and we now affirm.

In *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968), the Supreme Court concluded that:

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

The Court then defined the extent of that necessary authority:

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. (Citations and footnotes omitted.)

*Id.* More recently, in *U.S. v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), the Court made clear that the level of suspicion for a *Terry* stop and frisk "is considerably less than proof of wrongdoing by a preponderance of the evidence." After noting that probable cause means "a fair probability that contraband or evidence of a crime will be found," the Court said that "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *Id. See Adams v.*

*Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also Simpler v. State,* 318 Md. 311, 317–19, 568 A.2d 22 (1990); *Lee v. State,* 311 Md. 642, 659–67, 537 A.2d 235 (1988); *Millwood v. State,* 72 Md.App. 82, 87–93, 527 A.2d 803 (1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

■ Although the necessity to strike a proper balance between the interests of the person and those of the government may require the imposition of additional restraints when the *Terry* stop is made solely to investigate a past crime, the Supreme Court has made it clear that strong concerns for public safety and for effective crime prevention and detection clearly justify the application of *Terry* principles where there exists reasonable suspicion of ongoing or imminent criminal activity. *United States v. Hensley,* 469 U.S. 221, 228–29, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985).

■ Applying these established principles of law to the facts of this case, we conclude that Judge Buchanan did not err in finding that Officer Garland had a reasonable and articulable suspicion that Quince was unlawfully carrying a handgun, and consequently that the officers' stop and frisk was constitutionally permissible. Initially, the officer was told to respond to a complaint that there was a man with a gun in the lower dining hall. The officer learned that the complaint had been made by the manager of the dining hall. This information carries with it significant indicia of reliability.

The person furnishing the information is identified, and therefore can be held accountable for his actions. As Chief Justice Rehnquist pointed out for the Court in *Adams v. Williams, supra,* 407 U.S. at 146–47, 92 S.Ct. at 1923, a person intentionally making a false report to the police may be subject to criminal prosecution. *See* Maryland Code (1957, 1987 Repl.Vol.) Art. 27, § 150. Moreover, the complainant held a managerial post with the University—a fact that tended to independently bolster his personal credibility,

and to ensure his accountability should he recklessly or falsely provide information to the police. The need for urgent action was apparent. A report of a man with a gun in any public place is a serious matter. The additional information that the subject was a former employee, present to pick up his final check, and was "wandering about the dining hall," did nothing to assuage legitimate concerns. It is apparent from the record that Officer Garland and Lieutenant Wheatley contemporaneously evaluated the complaint as both legitimate and serious, as did other campus police officers who responded to the initial call.[1]

The police were able to immediately verify some details of the report. Upon their arrival at the bus stop opposite Newell Hall, they observed, in the company of a black female, a black male who matched the description that had been given by the complainant.

We do not understand the defendant to suggest that these facts, standing alone, would not justify a *Terry*-type stop and frisk. Instead, the defendant argues that *additional* information, which was known to the dispatcher and to Officer Garland before Quince was stopped, so undercut the apparent reliability of the complaint as to render the subsequent stop and frisk unconstitutional. Specifically, Quince argues, the police were told that the only basis upon which the complainant concluded that Quince had a gun was the statement made by Quince's former co-workers to the effect that Quince "always carried a firearm." Conceding for the purpose of argument that the police could have acted as they did upon a "man with a gun" complaint emanating from a known and reliable source, Quince argues that once the basis of that complaint is made known to the police, and is no more substantial than the conclusion of

---

1. Officer Garland testified that other campus police officers responded to the call. Officer Garland's application for a charging document indicated that a total of five officers responded.

former co-workers that Quince "always" carried a gun, the justification for the stop and frisk disappears.

The defendant contends that the additional facts denigrated the quality of the information possessed by the police in several respects. First, he argues that the only information that linked him with a gun came from anonymous informants. Although he concedes that under some circumstances an anonymous tip may furnish the requisite reasonable suspicion for a stop and frisk, he contends that ordinarily anonymity weighs heavily against reliability. We have difficulty accepting Quince's basic premise—that the informants were anonymous. It is true that their names were not immediately known to the police, but it is equally true that the police knew that they were employees of the dining hall who had reported this information to their superior, and that as a result their identities were readily ascertainable and they could be held fully accountable for their actions. We do not view the employees as anonymous informants.

Quince's next point is more substantial. He points out that the representation "he always carries a firearm" is not entitled to the same weight as the statement "I saw him with a firearm." We agree. One who says he saw a person with a gun states the basis of his knowledge, and the hearer immediately appreciates that it is firsthand knowledge. One who says "he always carries a gun" may be speaking from firsthand knowledge, or as a result of the subject's general reputation, or from unsubstantiated rumor. Additionally, the adverb "always" as popularly used in this context does not uniformly enjoy its literal meaning. It is often used to signify one's belief that another usually or customarily does the act described.

Intriguing as Quince's argument on this point may be, we think it misses the mark. The record reflects that the information was conveyed to the police in such a manner that the fact that former employees had reported that Quince "always" carries a gun was reasonably understood by the police to be supplemental to and in confirmation of

the initial report that Quince had a gun in the dining hall. Officer Garland was emphatic that the initial dispatch to him was that a man with a gun was in the lower dining room, and in a later transmission he was warned that former co-employees were saying that this man "always carried a firearm." He testified:

I followed my instructions of the dispatcher. The first call I received was that the defendant was armed, was a man with a gun, that was my first response. All other information that came over was just more substantial, more to make sure that I would protect myself.

Given the information that Officer Garland received, and the sequence in which he received it, we conclude that he had a reasonable and articulable suspicion that Quince was unlawfully carrying a weapon on his person.

The defendant has a final arrow in his quiver. He asserts that the ultimate determination of the legality of the search within the meaning of the Fourth Amendment must turn on the totality of the evidence possessed by the relevant police "team", in this case the dispatcher. *See United States v. Hensley, supra,* 469 U.S. at 229–33, 105 S.Ct. at 680–82; *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Maryland,* 479 F.2d 566, 569 (5th Cir.1973). Quince argues that the dispatcher should have known that the subsequent information was in denigration of the initial information, and not supplemental thereto; or, in the alternative, that all of the information may have come to the dispatcher at one time, and he may have precipitated a misunderstanding by the manner in which he dispatched it.

The difficulty with the defendant's argument is that it is not supported by the record. Neither the dispatcher nor the complainant was called as a witness. All that is known, is known from the testimony of Officer Garland. We will not speculate that the dispatcher received information in an order different from that in which he communicated it to Officer Garland, nor that the dispatcher should have interpreted the information actually received in a manner differ-

ent from that of the officer. The fact that either or both of them might have been able to retrospectively conclude that no one had actually seen Quince with a gun in the dining hall that day does not detract from the reasonableness of the conclusions honestly reached in the urgency of the moment, and upon which action was appropriately taken. The State has demonstrated that Officer Garland had a reasonable and articulable suspicion that justified the actions he took, and there is no evidence of record demonstrating an inadequate foundation for that belief.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.