*Ira Chase v. State of Maryland*, No. 85, September Term, 2015.  Opinion by Battaglia, J.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – REASONABLE SUSPICION**

Reasonable suspicion to support a lawful investigatory stop and frisk under *Terry v. Ohio* is satisfied when presented with particularized facts in support a belief that the suspect may be armed and dangerous.

**CONSTITUTIONAL LAW – ARREST**

Use of handcuffs does not elevate an investigatory detention to an arrest when concern that weapons are present and officer safety provide the bases. Continued use of handcuffs after a frisk of the suspect reveals no weapons does not convert the detention into an arrest when the suspect's unsearched vehicle remains in close proximity, the criminal investigation is unfolding and the duration the suspect is in handcuffs before arrest is short.

Circuit Court for Baltimore County
Criminal Case No. 03-K-13-005785
Argued: May 9, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 85

September Term, 2015

_____

IRA CHASE

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Harrell, Jr., Glenn T. (Retired, Specially
Assigned,
Battaglia, Lynne A. (Retired, Specially
Assigned),

JJ.

_____

Opinion by Battaglia, J.

_____

Filed: August 19, 2016

This case presents us with the opportunity, yet again, to explore the parameters of reasonable suspicion to support a *Terry* stop,[1] as well as what constitutes an arrest for Fourth Amendment purposes. Ira Chase, Petitioner, presents the following questions for our review:

> 1. Does reasonable suspicion that an individual is engaged in drug activity, by itself, constitute reasonable suspicion that the individual is armed and dangerous?
>
> 2. Under this Court's case law recognizing that a display of force by the police, such as placing a suspect in handcuffs, constitutes an arrest requiring probable cause absent reasonable suspicion that the suspect is armed and dangerous, was Petitioner under arrest when he and the co-occupant of Petitioner's Jeep Cherokee were removed from the Jeep and placed in handcuffs, where the police had reasonable suspicion that the two men were engaged in drug activity in the Jeep but lacked reasonable suspicion that they were armed and dangerous?
>
> 3. Assuming, *arguendo*, that the police had reasonable suspicion to believe that Petitioner and his co-occupant were armed and dangerous when they were removed from the Jeep and handcuffed, was that reasonable suspicion dispelled when the officers patted them down and found no weapons, thereby rendering their continued detention and questioning by the officers while awaiting the arrival of a drug sniffing dog an arrest, and not a mere detention, that was not supported by probable cause?

In 2013, Chase was indicted in the Circuit Court for Baltimore County, Maryland for possession of cocaine with intent to distribute, manufacturing cocaine, possession of cocaine and possession of less than 10 grams of marijuana. He moved to suppress various pieces of evidence seized by Baltimore County police officers from his person, that being a motel key, and from the motel itself, to include narcotics and narcotics paraphernalia;

---

[1] A *Terry* stop is an investigatory detention and frisk for weapons based upon an officer's reasonable suspicion that the individual may be armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

he alleged that his detention in handcuffs while a car that he had been driving was searched constituted an unlawful arrest and the attendant seizure of the motel key and discovery of physical evidence in the motel room were the fruits of that arrest. Judge Patrick Cavanaugh of the Circuit Court for Baltimore County denied Chase's motion to suppress, and Chase, thereafter, entered a conditional guilty plea[2] to one count of possession of cocaine with intent to distribute. Judge Cavanaugh, in denying the motion to suppress, determined:

> Okay. It's a very interesting case. I'm familiar with all the cases you've handed up, Mr. Tompsett. The *Carter* case is of particular interest, it's one of Judge Moylan's shorter opinions. The man was stopped or he wasn't stopped, he's already parked under the policeman's observation when the other car pulls in. They're backed in next to each other, it's a high crime area. I'm familiar with the area. I don't know how many cases I've had from

---

[2] Entry of a conditional guilty plea pursuant to Rule 4-242(d) "reserves" the right to appeal:

> (d) Conditional Plea of Guilty.
>
> (1) Scope of Section. This section applies only to an offense charged by indictment or criminal information and set for trial in a circuit court or that is scheduled for trial in a circuit court pursuant to a prayer for jury trial entered in the District Court.
>
> (2) Entry of Plea; Requirements. With the consent of the court and the State, a defendant may enter a conditional plea of guilty. The plea shall be in writing and, as part of it, the defendant may reserve the right to appeal one or more issues specified in the plea that (A) were raised by and determined adversely to the defendant, and, (B) if determined in the defendant's favor would have been dispositive of the case. The right to appeal under this subsection is limited to those pretrial issues litigated in the circuit court and set forth in writing in the plea.
>
> (3) Withdrawal of Plea. A defendant who prevails on appeal with respect to an issue reserved in the plea may withdraw the plea.

that side of town involving drugs. They're in the parking lot of the hotel, nobody gets out of the car, goes into a hotel, don't do anything except meet each other at a car. The furtive acts give me some concern because of the officer's safety. They see this going on inside the vehicle as they're approaching. The inconsistent stories, you know, one's watching the ballgame, the other one is going to Maryland Live Casino. I think that's what really triggered the call for the K–9 to come out and it was fairly quick after they were stopped. I believe the K–9 arrived within ten minutes of the police approaching the vehicle to begin with. I think it is a classic Terry case, (inaudible) to the high crime in the area, drugs, we know that guns are involved with drugs. So I can understand the concern for officers' safety. The dog alerts on the side of the vehicle that Mr. DeLillo just got out of and he's the one who later on states, you know, I came to buy an eight ball to get, got fourteen grams, got more than he came for. Certainly, got more than he came for when he got the cuffs on him. I believe I don't have any choice but to deny your Motion, Mr. Cardin. I think it's a good stop, it's a good search. I was concerned about the cuffs going on when they went on and the comments that were made by the two gentlemen were after they were read Miranda. They were Mirandized right away. I know you disagree with me, Mr. Davis, you've been sitting there shaking your head sideways since you came in the door today. The Motion to Suppress is denied.

Chase appealed to the Court of Special Appeals, which, in a reported opinion, *Chase v. State*, 224 Md. App. 631, 121 A.3d 257 (2015), affirmed.[3]

---

[3] Our standard for the review of a denial to suppress evidence is:

> In reviewing a Circuit Court's grant or denial of a motion to suppress evidence under the Fourth Amendment, we ordinarily consider only the information contained in the record of the suppression hearing, and not the trial record. Where, as here, the motion is denied, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion. Although we extend great deference to the hearing judge's findings of fact, we review independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of law and, accordingly, should be suppressed.

*Williamson v. State*, 398 Md. 489, 500, 921 A.2d 221, 228 (2007) (internal citations omitted) (internal quotation omitted). *See also Holt v. State*, 435 Md. 443, 457–58, 78 A.3d 415, 423 (2013); *Reid v. State*, 428 Md. 289, 305–06, 51 A.3d 597, 607 (2012); *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135–36 (2007).

During the suppression hearing, Detective Andrew Melnyk of the Baltimore County Police Department testified that in September of 2013 he and his partner, Detective Young,[4] assigned to the Vice/Narcotics Unit, were patrolling the area around Security Boulevard. Detective Melnyk related that the area was "known for illicit narcotic activity," as it is close to Interstate 70 and the Baltimore Beltway.

Detective Melnyk further noted that on the evening of September 10th he and Detective Young were in the area around the Days Inn on Whitehead Court, which they knew to be a "high area of drug trafficking." Detective Melnyk testified that "My unit as well as myself have participated in numerous search warrants and apprehensions resulting in the seizure of illicit drugs and U.S. currency, as well as weapons[,]" and continued to describe the events of that evening in which two individuals interacted in a Jeep Cherokee:

> STATE: And do you recall what time of day you were on the parking lot at the Days Inn?
>
> DETECTIVE MELNYK: It was the evening shift, around 6:00, 6:45.
>
> STATE: And was it, was it, what position did you take on the parking lot of the Days Inn?
>
> DETECTIVE MELNYK: As we pulled in the parking lot, we noticed a, a white Jeep Cherokee parked on the lot occupied later identified by the Defendant. He was utilizing his cell phone backed into a parking spot, so we took up a position where we could maintain surveillance on this vehicle.
>
> * * *
>
> STATE: And how long did you watch the Defendant's vehicle for?

---

[4] Detective Young's first name is not in the record.

DETECTIVE MELNYK: Approximately two minutes when we observed a second vehicle, a Lexus, back into a parking spot, he actually backed in catty-corner, taking up two parking spots next to the Jeep Cherokee.

\* \* \*

DETECTIVE MELNYK: The driver of the Lexus exited his vehicle, approached the Jeep Cherokee and got into the passenger side of the Jeep Cherokee, leaving his vehicle parked like I explained in two parking spots.

STATE: Does this type of behavior have any type of significance to you?

\* \* \*

DETECTIVE MELNYK: Through, through my, I've taken a forty hour basic narcotic investigator class as well as a weeklong class in the Academy for drug identification and characteristics of people that are involved in the distribution of illegal narcotics, often times nowadays people utilize vehicles to conceal the transactions from law enforcement as well as the hotel that they're at –

\* \* \*

DETECTIVE MELNYK: They use the hotel to conceal the identity of their home address. So with the Defendant in his vehicle, as well as the Lexus pulling in and the driver of the Lexus getting out of his vehicle into the Defendant's vehicle, as well as the area that they're in, it's a known high drug area, they did not utilize any services of the Days Inn, which is where they were parked. We believed that there was illegal drug activity taking place, or criminal activity at that matter.

Detective Melnyk further related that after waiting a short period of time to see if any further activity occurred, he and Detective Young approached the Jeep, identified themselves as police officers and removed its occupants:

DETECTIVE MELNYK: We waited a brief period to, to see if there was going to be any activity farther and there wasn't. At that point, we drove our vehicle, identified ourself as police, approached the vehicle and detained both occupants inside the white Jeep Cherokee.

- 5 -

STATE: And why did you detain those two subjects?

* * *

DETECTIVE MELNYK: Based on the reasonable suspicion that they were involved in illegal activity based on the totality of the circumstances, the location, the lack of activity involving the hotel room and the way they were parked, as well as the mannerisms that, from the driver entering the Grand Cherokee from the Lexus.

On cross-examination, Detective Melnyk testified in more detail about the furtive movements of the driver in reaching under his seat and putting his hand in his pocket which precipitated the removal of the driver, who turned out to be Chase, and his companion from the Jeep Cherokee and handcuffing them:

MR. CARDIN: All right. Now, when you say they were detained, they were handcuffed?

DETECTIVE MELNYK: Yes.

MR. CARDIN: All right.

DETECTIVE MELNYK: The reason we take them out of the vehicle, Your Honor, is to prevent them from accessing any sort of weapons that could harm us. . . . They were, they were asked to step from the vehicle at which point we placed them in handcuffs.

MR. CARDIN: I see.

* * *

STATE: Why did you place them in handcuffs prior to the K-9 alerting for probable cause?

DETECTIVE MELNYK: We noticed, as we were approaching the vehicle, the driver specifically, as well as the passenger, they were moving, looks like they were moving things around there, reaching under the seat. The passenger immediately put his hands in his pocket. At that point, for the safety of myself and Detective Young, they were requested to exit the vehicle and we put them in handcuffs just to make sure they didn't have

- 6 -

any weapons and detaining them. They were not free to leave. The, the reason for the handcuffs were solely based on the safety of everybody involved, based on the furtive movements that we observed inside the vehicle as we were approaching the vehicle.

Detective Melnyk continued his testimony, recounting the differing stories given by Chase and the other man and the detectives' decision to request that a K-9 unit come to the location:

> STATE: And starting with the individual who got out of his Lexus and into Mr. Chase's car, this Defendant's car, what, if anything, did he tell you about what was going on there?
>
> DETECTIVE MELNYK: He advised that he was meeting Phil and that him and Phil were going to a hotel room to watch the Oriole game.
>
> STATE: And did you speak to Mr. Chase?
>
> DETECTIVE MELNYK: I did.
>
> STATE: And what did Mr. Chase advise?
>
> * * *
>
> DETECTIVE MELNYK: Mr. Chase advised that he was going to meet his cousin and attend the Maryland Live Casino.
>
> * * *
>
> STATE: Can you explain to the Court Mr. Chase's demeanor while you were speaking with him?
>
> DETECTIVE MELNYK: He was, he was very irate with the police presence. He claimed that he had done nothing wrong and I explained to him our observations which caused us to maintain the detention of the Defendant.
>
> STATE: So with the maintained detention and now these two different stories, what, if anything, did you do?

DETECTIVE MELNYK: Based on reasonable suspicion, I notified via my police radio dispatch to start a K-9 to our location to further the investigation.

Officer Bernardo Tubaya of the Baltimore City Police K-9 Unit also testified. He recounted that he was dispatched to the motel parking lot at 6:52 pm and arrived approximately eight minutes later. He also related that the police dog alerted to the presence of narcotics during the "sniff" of the Jeep Cherokee:

STATE: And what type of response, if any, did your dog give for [the Jeep Cherokee]?

OFFICER TUBAYA: When he scanned the vehicle, he gave me indicators and he alerted to the passenger side door.

STATE: Okay and how does your dog alert?

OFFICER TUBAYA: He, his breathing pattern changes, he stops, he looks at the door and he gives me a sit alert, in which he sits and looks at the door.

STATE: Okay and he did all those things in this case?

OFFICER TUBAYA: Yes.

Detective Melnyk related that he subsequently performed a search incident to arrest, after the police dog had alerted, which produced a motel room key:

STATE: And when the K-9 officer arrived, did you explain to him what was going on at the scene?

DETECTIVE MELNYK: I did. . . .

STATE: And did he use his dog?

DETECTIVE MELNYK: He did use his dog.

STATE: And did his dog alert on either one of the vehicles?

DETECTIVE MELNYK: His dog alerted on the Jeep Cherokee.

STATE: And the Jeep Cherokee belonged to which Defendant?

DETECTIVE MELNYK: Defendant Chase.

STATE: Okay. When the dog alerted, what, if anything, did you and your partner do?

DETECTIVE MELNYK: We initially questioned the Defendant for illegal substances within his vehicle. At that point, he began to ignore our, our requests and stop talking to us, which at that point, it became an arrest.

STATE: And did you search the Defendant incident to that arrest?

DETECTIVE MELNYK: I did.

STATE: And what, if anything, did you find?

DETECTIVE MELNYK: We found some currency as well as a room key for the Days Inn.

Detective Melnyk related that he and Detective Young then applied for and obtained a search warrant for the room associated with the key found during the search of Chase's person; the subsequent search of the room uncovered 138 grams of cocaine and narcotics paraphernalia.

Chase contends that he was subject to an unlawful arrest when he had been removed from the Jeep and handcuffed without the officers having a reasonable suspicion that he possessed a weapon, citing a footnote in *Dashiell v. State*, 374 Md. 85, 101, 821 A.2d 372, 381–82 (2003), in which we acknowledged that, "[w]eapons and guns are widely known to be used in narcotics trafficking," but that "[w]hile this may be a factor in a totality determination of whether the officers possessed the requisite reasonable suspicion to fear for their safety, this, merely coupled with evidence of drug trafficking,

normally will not be the determinative factor." *Id.* at n.4, 821 A.2d at 381–82 n.4. Chase asserts that Detective Melnyk offered no particularized facts in his testimony to support a belief that he was armed and dangerous and, therefore, lacked the reasonable suspicion necessary to lawfully detain him.

The State argues, conversely, the totality of the circumstances supported the officers' actions, as Detectives Melnyk and Young were patrolling an area known for illegal narcotic activity, observed Chase and his associate engaging in behavior indicative of illegal drug activity and observed movements by Chase and his companion that raised concern regarding the possibility that the individuals were armed, thereby compromising the safety of the officers. Thus, according to the State, Detective Melnyk articulated particular facts to support his having placed handcuffs on Chase.

Under the Fourth Amendment, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), the United States Supreme Court addressed the issue of whether the investigatory detention and frisk of an individual for weapons was violative of the Fourth Amendment.

In *Terry*, a lone police officer, McFadden, observed two men, including Terry, pacing back and forth in front of a store. Based upon his experience, McFadden suspected that the men were "casing a job, a stick-up" and, when a third man arrived, intervened.

*Id.* at 6–7, 88 S.Ct. at 1872, 20 L.Ed.2d at 897. Dissatisfied with their answer to his request for their names and concerned that the men may have been armed, McFadden patted-down the exterior of their clothing, feeling for a gun. *Id.* at 7, 88 S.Ct. at 1872, 20 L.Ed.2d at 897. He recovered a gun from the pocket of the overcoat of one of the men, later identified as Terry, as well as another gun from the pocket of one of the other men's coats. *Id.*

The Supreme Court determined that McFadden's actions in stopping Terry and frisking him for the presence of weapons did not violate the Fourth Amendment based upon the officer's belief that Terry was armed and dangerous. In so doing, the Court balanced officer and public safety against the individual's right against intrusion:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Id.* at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. The Court iterated, however, that the officer's reasonable belief that the person is armed must be based on more than an "inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

Almost a decade later, the Court reiterated in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), that officer safety could justify a *Terry* stop

and frisk. In *Mimms*, two police officers on patrol spotted a vehicle bearing an expired license plate and stopped the car. 434 U.S. at 107, 98 S.Ct. at 331, 54 L.Ed.2d at 334. As Mimms, responding to a request from one of the officers, stepped out of the car, one of the officers noticed a "bulge" under Mimms's jacket. *Id.* Concerned that the bulge could be a gun, the officer frisked Mimms and recovered a loaded .38 caliber gun from Mimms's waistband. *Id.* The Pennsylvania Supreme Court reversed Mimms's conviction for carrying a concealed weapon and for the unlawful possession of a firearm without a license on Fourth Amendment grounds.

The Supreme Court reversed, basing its decision on the rationale of *Terry*, which justified the police ordering Mimms out of the car, once he had been lawfully detained. *Id.* at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 335–36. The Court stressed that the safety of the officers was of paramount concern:

> We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio*, *supra*. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.

*Id.* at 110, 98 S.Ct. at 333, 54 L.Ed.2d at 336. The Court iterated that the request by the officer that Mimms step out of the car was *de minimis*, and "at most a mere inconvenience [that] cannot prevail when balanced against legitimate concern for the officer's safety." *Id.* at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337.

Following *Terry* and *Mimms*, we have had a number of occasions to refine our jurisprudence regarding what is reasonable suspicion and the level of particularization

necessary to warrant a *Terry* stop. In *Crosby v. State*, 408 Md. 490, 970 A.2d 894 (2009), we articulated that which constitutes an officer's reasonable suspicion under a "totality of the circumstances":

> There is no standardized test governing what constitutes reasonable suspicion. . . . First, reasonable suspicion is a " 'common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.' " While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an "inchoate and unparticularized suspicion or 'hunch.' "
>
> Second, a court's determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. Thus, "the court must ... not parse out each individual circumstance for separate consideration.". . . In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. Such deference "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " To be sure, "[a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer."
>
> Third, the reasonable suspicion standard carries limitations; it " 'does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her.' " Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity. As this Court observed previously, we shall not " 'rubber stamp' conduct simply because the officer believed he had the right to engage in it." In other words, there must be an "articulated logic to which this Court can defer."

408 Md. at 507–09, 970 A.2d at 903–04 (internal citations omitted).

We have explored the level of particularization needed to justify a *Terry* stop when based on officer and public safety on a number of occasions, most notably in

*Quince v. State*, 319 Md. 430, 572 A.2d 1086 (1990); *Derricott v. State*, 327 Md. 582, 611 A.2d 592 (1992); *State v. Smith*, 345 Md. 460, 693 A.2d 749 (1997); *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (2003); *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003); *Cotton v. State*, 386 Md. 249, 872 A.2d 87 (2005); *Williamson v. State*, 398 Md. 489, 921 A.2d 221 (2007); and *Longshore v. State*, 399 Md. 486, 924 A.2d 1129 (2007).

In *Quince v. State*, a police officer responded to a call over the radio that an armed black man, accompanied by a black female, had been seen in "the lower dining room" at Towson State University. The manager of the dining hall had reported that the man with the gun seen "wandering about the dining hall" was a former employee who had picked up his last pay check. Co-workers of the employee indicated that he "always carried a firearm."

The officer, thereafter, spotted Quince, who matched the description of the armed man, standing with a black female at a bus stop. After confirming that Quince met the description received over the police radio, the officer approached Quince and asked if he had a gun, to which Quince responded in the negative. A pat-down of Quince, however, revealed a .357 magnum pistol in his waistband.

We noted the Supreme Court's emphasis on public safety as it related to a *Terry* stop,

> . . . the Supreme Court has made it clear that strong concerns for public safety and for effective crime prevention and detection clearly justify the application of *Terry* principles where there exists reasonable suspicion of ongoing or imminent criminal activity.

319 Md. at 434, 572 A.2d at 1088, and concluded that the officer had reasonable suspicion that Quince was unlawfully carrying a weapon, based on the information provided by the dining hall manager; the report of a man with a gun in a public place also raised concerns for public safety:

> The need for urgent action was apparent. A report of a man with a gun in any public place is a serious matter. The additional information that the subject was a former employee, present to pick up his final check, and was "wandering about the dining hall," did nothing to assuage legitimate concerns.

*Id.* at 435, 572 A.2d at 1088. Clearly, we determined, the officer possessed a reasonable suspicion that Quince was armed:

> The record reflects that the information was conveyed to the police in such a manner that the fact that former employees had reported that Quince "always" carries a gun was reasonably understood by the police to be supplemental to and in confirmation of the initial report that Quince had a gun in the dining hall. Officer Garland was emphatic that the initial dispatch to him was that a man with a gun was in the lower dining room, and in a later transmission he was warned that former co-employees were saying that this man "always carried a firearm." He testified:
>
> > I followed my instructions of the dispatcher. The first call I received was that the defendant was armed, was a man with a gun, that was my first response. All other information that came over was just more substantial, more to make sure that I would protect myself.

*Id.* at 436–37, 572 A.2d at 1089.

In *Derricott v. State*, 327 Md. 582, 611 A.2d 592 (1992), Corporal Thomas of the Maryland State Police observed, through his stationary radar operation, a brown sports car driving 89 miles per hour on Interstate 270. Corporal Thomas pursued the car, which he pulled over into the highway median strip without incident. The driver, later identified as Derricott, complied with Corporal Thomas's instruction to furnish his permit and

registration. Derricott did so without hesitation or nervousness. Corporal Thomas, who stood beside the driver's door, testified that he noticed several indicia of a "drug courier" profile. Corporal Thomas's check of the permit and registration indicated both were valid, the car had not been reported stolen and no warrants had been issued against Derricott.

Corporal Thomas, however, requested a back-up officer and "drug dog" for the purpose of conducting a "sniff." When the back-up officer arrived, Corporal Thomas ordered Derricott, who had been sitting in the car and had not exhibited any suspicious behavior, to get out of the car, after which he conducted a pat-down search of Derricott for weapons; no weapons were found. Corporal Thomas then approached the open driver's door of the car and looked inside whereupon he observed a cellophane bag containing smaller glassine bags containing a substance he thought was cocaine. Derricott was, thereafter, convicted of possession of a dangerous substance with the intent to distribute and the Court of Special Appeals affirmed.

We reversed Derricott's conviction, noting that, "It is only when the circumstances also support the articulable suspicion that the person detained is armed and dangerous that the frisk of outer garments and the limited search of a passenger compartment may be authorized." 327 Md. at 588, 611 A.2d at 595. Evaluating the totality of the circumstances to determine whether a reasonable officer in a similar situation would have believed his or another's safety was being compromised, we stated:

> By Corporal Thomas' own testimony, the only facts which contributed to his decision to search Derricott and his vehicle were those that corresponded to the drug courier profile. No other behavior aroused

> Corporal Thomas' suspicion; nothing else suggested to the trooper that he was engaged in more than a routine traffic stop.

*Id.* at 588, 611 A.2d at 596. We were not, then, persuaded that Corporal Thomas possessed a reasonable suspicion that Derricott was armed and dangerous, as required by *Terry*.

In *State v. Smith*, 345 Md. 460, 693 A.2d 749 (1997), a Baltimore Police Officer, responding to a report that individuals were selling drugs and discharging firearms at a corner in Baltimore, observed Smith tuck something into his waistband as the group of men he was standing with dispersed. Believing that Smith was sticking a gun into the waist of his pants, the officer stopped Smith. After detaining Smith, the officer conducted a frisk of his person for weapons and, finding nothing, pulled Smith's shirt out of his pants, which caused a small plastic bag containing cocaine to fall out. Smith moved to suppress the cocaine, arguing that the officer lacked reasonable suspicion to stop and frisk him. Although the trial court denied the motion, the Court of Special Appeals reversed and held that while the initial pat-down was proper, the pulling out of Smith's shirt was not.

We affirmed, noting that, "The purpose of a *Terry* frisk is not to discover evidence, but rather to protect the police officer and bystanders from harm." 345 Md. at 465, 693 A.2d at 751. The intrusion, we noted, should have been reasonably designed to discover readily available items that could have been used to harm, because "the proper balance between the sometimes competing interests of the police officer and the individual requires that the police officer employ the least intrusive means of discovering

and neutralizing any concealed weapons." *Id.* at 468, 693 A.2d at 753. We determined that the initial stop and frisk of Smith was justified under *Terry*:

> Officer White had a reasonable, articulable suspicion that Smith was armed and dangerous, and thus was entitled to engage in a minimally intrusive frisk for concealed weapons. *See Terry*, 392 U.S. at 21–24, 88 S.Ct. at 1880–81, 20 L.Ed.2d at 906–07. Upon encountering Smith, Officer White conducted a pat-down of Smith's exterior clothing. This initial frisk was clearly proper.

*Id.* at 469, 693 A.2d at 753.

In *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (2003), Rashida Dashiell, who was present in the home to be searched pursuant to a warrant, was handcuffed and frisked, although she was not named in the warrant. The search warrant contained specific information, obtained from informants, stating that narcotics and several guns were inside the home. As a result of the frisk, a plastic bag removed from Dashiell's pocket contained what she described as "dope." Dashiell was placed under arrest; a subsequent search uncovered crack cocaine and marijuana in Dashiell's possession.

In refuting Dashiell's allegation that her initial detention was unlawful because she had not been named in the warrant and the police had no basis to stop her, we stated:

> The objective reasonable suspicion standard is considerably less than the preponderance or probable cause standards. While absolute certainty is not required, a mere hunch or unparticularized suspicion will not suffice. [We] [have] said that reasonable suspicion "is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." Determinations of whether a particularized reasonable suspicion exists should be analyzed under the totality of the circumstances.

374 Md. at 97, 821 A.2d at 379. We held that, under the totality of the circumstances, the police held a reasonable belief that Dashiell could have been armed and dangerous as the

result of particularized facts contained in the application for the search warrant; including reference to drug trafficking at the house as well as particularized information that guns were located in the house where Dashiell was present.

It is true though, as Chase argues, that in *Dashiell v. State*, we iterated in a footnote that the officers's training and experience that persons involved with drug trafficking carry weapons would not normally, alone, provide the necessary reasonable suspicion to support an investigatory frisk:

> While this may be a factor in a totality determination of whether the officers possessed the requisite reasonable suspicion to fear for their safety, this, merely coupled with evidence of drug trafficking, normally will not be the determinative factor. Generally, this factor by itself would amount to nothing more than a "hunch" as described in *Terry*.

374 Md. at 101 n.4, 821 A.2d at 381–82 n.4. We, however, in *Dashiell*, relied on the facts in the search warrant that particularized the presence of weapons and drugs in the home.

In *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), Deshawn Ransome was on the sidewalk with another man in an area of Baltimore City that had had numerous reports of narcotics activity and loitering. Three police officers on patrol in an unmarked car spotted the pair and, although the officers did not observe Ransome doing anything out of the ordinary, approached. Ransome turned to look at the car as it came to a stop. One officer, Officer Moro, regarded Ransome suspiciously and noticed a bulge in one of Ransome's pockets. The officer, who was not in uniform, approached Ransome, asked him several questions and then conducted a pat down. The frisk revealed a bag of marijuana in Ransome's waist area, but the officer did not investigate the bulge that had drawn his attention initially. The officer placed Ransome under arrest and, after an

additional search, recovered ziplock bags, some cocaine, and a roll of cash which constituted the bulge.

Ransome moved to suppress the evidence taken from his person. His motion was denied, and Ransome was convicted. The Court of Special Appeals affirmed.

We reversed our intermediate appellate court, holding that the officer did not have reasonable suspicion to support the stop and frisk of Ransome. Our conclusion was based on the officer's lack of particularized facts to support a belief that Ransome was armed and dangerous:

> Officer Moro never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious. As noted, *Terry* requires the officer to point to "specific and articulable facts" justifying his conduct. Unlike the defendants in the cited cases, or indeed in *Terry*, petitioner had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time Officer Moro drove by. He had not committed any obvious offense, he was not lurking behind a residence or found on a day care center porch late at night, was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.

373 Md. at 109–10, 816 A.2d at 907.

In *Cotton v. State*, 386 Md. 249, 872 A.2d 87 (2005), a lengthy four-year investigation into an alleged open-air drug market resulted in the issuance of a warrant to search a residence, outbuildings and vehicles located on the property. Although only three individuals were named in the warrant, it averred that other persons with violent criminal histories could have been present. When police executed the warrant and began

to search the property, Steven Cotton was present, was detained, as well as handcuffed by the police. Cotton remained handcuffed and was left to sit on a log for ten minutes while the house was secured before an officer approached and gave him his *Miranda* warnings, at which point Cotton stated that he possessed marijuana.

Cotton moved to suppress the evidence against him, arguing that he was merely a bystander and that the police had no probable cause to believe he was involved in any criminal activity and, therefore, his detention was an unlawful arrest. We noted that the Fourth Amendment did not prohibit all searches and seizures, only unreasonable ones. In that particular case, the presence of individuals at a location where a warrant was issued presented concern for safety:

> [I]n executing a warrant such as that issued here, for a premises known to be an open-air drug market where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and, except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting. It really cannot be otherwise. The police do not know who may be at the scene when they arrive. The people they find there, in or on the property to be searched, are not wearing identifying labels—supplier, customer, processor, bodyguard, innocent bystander. It would be decidedly *unreasonable* to expect the police simply to give a friendly greeting to the folks there and proceed to search the house without another thought as to who those people are or what they may do.

386 Md. at 258–59, 872 A.2d at 92–93. We held, therefore, that the fact that Cotton was placed in handcuffs, guarded and given his *Miranda* warnings did not establish a *de facto* arrest:

> In summary, Cotton's reliance on the facts that he was handcuffed, placed under guard, and given *Miranda* warnings as establishing that he was *de*

*facto* arrested either upon his initial detention or after fifteen to twenty minutes of it finds no substantial support in either Federal or this Court's current jurisprudence. Acceptance of that view would place both police officers and innocent bystanders at considerable risk.

*Id.* at 267, 872 A.2d at 97. Rather, the officers's concern for their safety as well as the safety of the public permitted the initial and continued detention.

In *Williamson v. State*, 398 Md. 489, 921 A.2d 221 (2007), Williamson was detained a short distance away from a house being searched pursuant to a warrant and returned to the house; the issue was whether he had been subject to a valid *Terry* stop. Williamson had been seen leaving the house and was 20 to 30 feet away when he was detained by the police, placed in handcuffs and brought back to the house. Subsequently, Williamson was questioned and indicated to the officer that drugs were located in the house. A search of the home uncovered cocaine and other drug paraphernalia. Williamson sought to suppress the evidence and statements he had made to the officer, arguing his detention was an arrest unsupported by probable cause.

We determined, however, that the detention and return of an occupant who was 20 to 30 feet away from a house during the execution of a search warrant was not an arrest. The justification for the detention and return of Williamson to the house was his proximity to the house and concern for officer safety, for, as we stated, "courts . . . have evaluated off-premises detentions of occupants based upon their proximity to the location to be searched taking into consideration the law enforcement interests that were articulated to justify the detention." 398 Md. at 511, 921 A.2d at 234. Importantly, the testimony had been adduced that Williamson was "just handcuffed for our safety" and

that he was a known occupant of the house for which the search warrant had been obtained. Thus, "[b]ecause the police, to promote officer safety, detained Williamson immediately after he left the house, before he entered his car and drove away, police were justified in detaining him and bringing him back into the house during the search." *Id.*

Finally, in *Longshore v. State*, 399 Md. 486, 924 A.2d 1129 (2007), we held that police officers lacked reasonable suspicion to support a *Terry* stop. After a confidential informant had provided information to police officers, they then observed Longshore meeting with people in a mall parking lot for several minutes. Longshore was later stopped by police as he was driving out of the mall. The officers removed Longshore from his vehicle and placed him in handcuffs while awaiting the arrival of a K-9 unit, having suspected drug activity was afoot. Two minutes later, the drug dog arrived and alerted to the presence of drugs in the center ceiling console area of the vehicle.

A search of the vehicle revealed a pill bottle containing crack cocaine in the center ceiling console, and Longshore later was indicted for possession of cocaine with intent to distribute. He moved to suppress the narcotics. Longshore's motion was denied, and he was convicted. The Court of Special Appeals affirmed.

We reversed, emphasizing that while the officers believed Longshore possessed drugs, they did not have any particularized facts to believe that Longshore was armed or dangerous or that the officers were concerned with their safety:

> The arresting officer acknowledged that, despite Longshore's nervousness, he was cooperative and did not exhibit any threatening behavior. The officers did not indicate that they were, in any way, concerned for their safety.

*Id.* at 514, 924 A.2d at 1145. The totality of the circumstances, then, did not support Longshore's detention under *Terry*, because concern for officer safety was not evident.

In the present case, we determine that the police officers possessed reasonable suspicion to stop Chase and ask him to leave the Jeep, based upon their belief that Chase may have been armed and dangerous. Detectives Melnyk and Young had observed behavior by Chase and his companion in the Jeep consistent with the hiding of illegal drugs as well as "furtive" movements that suggested weapons could have been secreted in the vehicle. We, again, emphasize concern for officer safety when weapons may be present may overcome concern about a limited *Terry* intrusion, such as asking Chase to get out of the Jeep.

Chase, however, also argues that even were there to have been reasonable suspicion to support his being asked by the officers to get out of the Jeep, his having been placed in handcuffs converted his detention from an investigatory stop into an arrest that required probable cause. Further, Chase asserts that his continued restraint in handcuffs amounted to an arrest after an unfruitful frisk of his person was completed.

The State argues, conversely, that the use of handcuffs did not elevate Chase's detention to an arrest, because the officers's concern for safety had not dissipated because the Jeep had not been searched for weapons. Releasing Chase from the handcuffs, the State asserts, could have provided Chase the opportunity to get a weapon.

While it is true that continued detention, once begun validly under *Terry*, can transform into an arrest, *Longshore v. State*, 399 Md. at 486, 924 A.2d at 1129,[5] it is also true that the detention may remain a *Terry* stop, if officer safety is an issue. *In re David S.*, 367 Md. 523, 789 A.2d 607 (2002).

In *Longshore*, *supra*, we recognized that, absent any special circumstances to justify the use of handcuffs by the police, such action transformed a *Terry* stop into an arrest:

> . . . [W]e hold that Longshore was arrested when he was asked to step out of the car and placed in handcuffs, and that *no special circumstances existed* that justified the police officers placing him in handcuffs. The officers conceded that he was stopped because they believed him to possess drugs. Unlike the circumstances in *In re David* S., there was no suspicion that a violent crime had occurred, nor any reason to believe that Longshore was armed or dangerous. The arresting officer acknowledged that, despite Longshore's nervousness, he was cooperative and did not exhibit any threatening behavior. The officers did not indicate that they were, in any way, concerned for their safety. Moreover, there was no reason to believe that Longshore was a flight risk. There was no indication by the police that they believed, nor any objective basis for concluding, that Longshore would run.

399 Md. at 514, 924 A.2d at 1145.

In the present case, Chase relies on our decision in *Longshore*, arguing that Detective Melnyk did not have reasonable suspicion that Chase was armed or that he represented a flight risk and, therefore, was unjustified in his use of handcuffs. Chase's reliance on *Longshore*, however, is misplaced. In that case, the officers presented no

---

[5] Chase also argues that our decision in *Reid v. State*, 428 Md. 289, 51 A.3d 597 (2012), supports his argument. *Reid* is inapposite, however, because use of a Taser gun with metal darts on Reid transformed the stop into a *de facto* arrest.

particularized observations nor did they indicate a belief that Longshore was armed, dangerous or that they were concerned with their safety. Under those circumstances, we held that the officers had no justification for placing Longshore in handcuffs. The instant case differs significantly from *Longshore* in that Detective Melnyk testified that the "reason for the handcuffs were solely based on the safety of everybody involved, based on the furtive movements that we observed inside the vehicle as we were approaching the vehicle."

The difference between *Longshore* and the instant case is significant because we have recognized that fear for officer and public safety can justify a continued detention by police. In *In re David S.*, 367 Md. 523, 789 A.2d 607 (2002), a police officer saw one of the participants in a drug transaction run away and, moments later, meet with David S. David S. then walked behind a building, reemerged displaying an object to another person, which David S. then tucked into his waistband; the officer believed the object to be a gun. The officer then chased David S., forced him to the ground, and handcuffed David S; cocaine was seized from David S.'s waistband.

After David S. was convicted, and the Court of Special Appeals had affirmed, we determined that the officer, based on the conduct he observed, had reasonable suspicion to believe that criminal activity was afoot and that David S. had a gun in his waistband. We opined that the use of handcuffs did not automatically elevate the investigatory *Terry* stop of David S. into an arrest as the officer possessed a reasonable belief that a threat to his safety existed.

One of our sister state courts also has had the opportunity to address the use of handcuffs during a *Terry* stop. In *State v. Wells*, 859 N.W.2d 316 (Neb. 2015), the Supreme Court of Nebraska held that the use of handcuffs during a *Terry* stop did not elevate a detention into an arrest. 859 N.W.2d at 316. In that case, two plain clothes officers in an unmarked car observed Wells's car in a parking lot known to be an "epicenter of narcotics". *Id.* at 322. Several people were observed to approach the driver's side window, stay momentarily and then leave, behavior consistent with the sale of narcotics. *Id.* at 323.

Wells was then seen flagging down a car and walking over to the car after it pulled into a parking lot. The officers entered the parking lot and approached Wells's car with their badges and firearms visible. As one officer approached the rear passenger door, he observed Wells "digging into [his] right pocket" and holding his arm under his jacket. *Id.* The officer "testified that he 'was very concerned [Wells] was either retrieving or hiding a weapon, or hiding narcotics on his person[,]' " removed Wells from the car and placed him in handcuffs. *Id.* A pat-down uncovered a baggie in the coin pocket of Wells's pants, which the officer suspected contained drugs. *Id.* at 323–24.

The court recognized that the use of handcuffs was appropriate when it was "reasonably necessary to protect officer safety during an investigative stop[,]" *id.* at 326 and so held:

> The record indicates that Cronin detained Wells in a reasonable manner under the circumstances, which stopped short of a full custodial arrest. Cronin had a strong suspicion Wells was in possession of a controlled substance. As Cronin approached the car, he witnessed Wells appear to be digging into his pocket, and when Cronin arrived at the car, Wells' right

- 27 -

arm was concealed underneath his jacket. The nature of Wells' suspected crime, trafficking narcotics, further justified Cronin's action. In Cronin's past experience as a member of the Lincoln/Lancaster County drug task force, he knew that narcotics users and traffickers often carry weapons. . . . Based on Wells' furtive movements and his apparent attempt to conceal something, Cronin had an immediate need for action. It does not appear that Cronin could have made the stop and, at the same time, ensured his safety in a less threatening manner. Finally, we note that Wells was detained only for a brief period of time before he allegedly assaulted Cronin and was placed under arrest.

*Id.* at 328.

We agree with the Nebraska Supreme Court, based upon our jurisprudence, that the use of handcuffs per se does not ordinarily transform a *Terry* stop into an arrest.

Chase, however, relies on *Reynolds v. State*, 592 So.2d 1082, 1086 (Fla. 1992), for the proposition that the continued use of handcuffs after a frisk of an individual fails to reveal any weapons elevates a *Terry* stop into an arrest. Chase's reliance on *Reynolds v. State* is unavailing. In that case, pursuant to a tip from a confidential informant regarding an area known for high sale and consumption of drugs, police officers spotted a car believed to have been involved with drug trafficking and followed it to a gas station. Three officers intercepted Reynolds when he emerged from the car and one placed him in handcuffs. After a pat-down failed to reveal any weapons, Reynolds remained handcuffed and twice consented to be searched, which revealed two bags suspected to contain marijuana. *Id.* at 1084. The trial court denied Reynolds's motion to suppress.

Reviewing the denial of the motion to suppress, the Supreme Court of Florida noted that the use of handcuffs during an investigatory *Terry* stop had been upheld, generally, where the use of the handcuffs was reasonably necessary to protect the

officer's safety or to prevent the suspect from fleeing. *Id.* at 1084. The action of handcuffing, therefore, "depends on whether it is a reasonable response to the demands of the situation." *Id.* at 1085. The court determined that the initial handcuffing of Reynolds was permitted, but that continued use was unlawful because the officers had no reason to believe that weapons were present:

> Although we find that the initial handcuffing of Reynolds was appropriate, we find that the continued use of handcuffs after the pat-down was illegal. *At that point, the officers had no reason to believe that weapons were present.* According to the testimony of one of the officers, the suspects offered no resistance, were not particularly belligerent, and did not make any threats. Under these facts, the use of handcuffs after the pat-down was not reasonably justified under the circumstances.

*Id.* at 1086 (emphasis added).

To the contrary, in the present case the officers believed weapons may have been present because of the actions, mannerisms and "furtive" movements of Chase and his companion as the Detective approached the Jeep. Although no weapons were found on Chase's person after the frisk, the officers continued to fear that weapons were in the Jeep. It was reasonable to detain Chase in handcuffs during the two minutes necessary to search the car and during the K-9 search.

We hold, therefore, that the continued use of handcuffs by Detective Melnyk constituted a *Terry* stop because of an ongoing concern for officer safety.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**